

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-21-1996

# Mathews v. Lancaster Gen Hosp

Precedential or Non-Precedential:

Docket 95-1391,95-1392,95-1532,95-1548

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Mathews v. Lancaster Gen Hosp" (1996). *1996 Decisions.* Paper 156.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/156

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 95-1391, 95-1392,
95-1532 and 95-1548

_____


ROBERT S. MATHEWS, M.D.,
                    Appellant at No. 95-1391

v.

LANCASTER GENERAL HOSPITAL;
LANCASTER GENERAL HOSPITAL FOUNDATION;
COLUMBIA HOSPITAL; COLUMBIA HOSPITAL FOUNDATION;
GERALD W. ROTHACKER, JR., M.D.; THOMAS R. WESTPHAL, M.D.;
JOHN SHERTZER, M.D.; J. PAUL LYET, M.D.;
JAMES P. ARGIRES, M.D.; HUGH H. HOKE, JR., M.D.


ROBERT S. MATHEWS, M.D.,
                    Appellant at No. 95-1392

v.

ORTHOPEDIC ASSOCIATES OF LANCASTER, LTD.


ROBERT S. MATHEWS, M.D.

v.

LANCASTER GENERAL HOSPITAL;
LANCASTER GENERAL HOSPITAL FOUNDATION;
COLUMBIA HOSPITAL; COLUMBIA HOSPITAL FOUNDATION;
GERALD W. ROTHACKER, JR., M.D.; THOMAS R. WESTPHAL, M.D.;
JOHN SHERTZER, M.D.; J. PAUL LYET, M.D.;
JAMES P. ARGIRES, M.D.; HUGH H. HOKE, JR., M.D.

                              Lancaster General Hospital,
                              Gerald W. Rothacker, Jr., M.D.,
                              Thomas R. Westphal, M.D.,
                              John H. Shertzer, M.D.,
                              J. Paul Lyet, M.D.,
                              James P. Argires, M.D.
                              and Hugh H. Hoke, Jr., M.D.,
                                   Appellants at No. 95-1532

ROBERT S. MATHEWS, M.D.

v.

ORTHOPEDIC ASSOCIATES OF LANCASTER, LTD.,
                              Appellant at No. 95-1548

_____

On Appeal from the United States District Court
      for the Eastern District of Pennsylvania
(D.C. Civil Action Nos. 93-cv-06774 and 94-cv-04647)
              _____


Argued January 10, 1996

Before:  SCIRICA, ALITO and WEIS, Circuit Judges

(Filed June 21, 1996)

JUDAH I. LABOVITZ, ESQUIRE (ARGUED)
Mann, Ungar, Spector & Labovitz
1709 Spruce Street
Philadelphia, Pennsylvania 19103

  Attorney for Robert S. Mathews, M.D.


REEDER R. FOX, ESQUIRE (ARGUED)
Duane, Morris & Heckscher
4200 One Liberty Place
Philadelphia, Pennsylvania 19103-7396

  Attorney for Lancaster General Hospital,
  Lancaster General Hospital Foundation,
  Gerald W. Rothacker, Jr., M.D.
  Thomas R. Westphal, M.D.,
  John H. Shertzer, M.D.,
  J. Paul Lyet, M.D.,
  James P. Argires, M.D.,
  and Hugh H. Hoke, Jr., M.D.



JONATHAN B. SPRAGUE, ESQUIRE (ARGUED)
Post & Schell
1800 JFK Boulevard, 19th Floor
Philadelphia, Pennsylvania 19103

Attorney for Columbia Hospital and
Columbia Hospital Foundation


JOHN G. HARKINS, JR., ESQUIRE (ARGUED)
Harkins Cunningham
1800 One Commerce Square
2005 Market Street
Philadelphia, Pennsylvania 19103-7042

Attorney for Orthopedic Associates of Lancaster, Ltd.


_____

OPINION OF THE COURT
_____


SCIRICA, Circuit Judge.

Dr. Robert Mathews brought suit against Lancaster General Hospital, Columbia Hospital, and several physicians, alleging defendants conspired to curtail his professional privileges in violation of the Sherman Act and state law. The district court held all defendants except Columbia Hospital were immune from suit for monetary damages under the Health Care Quality Improvement Act of 1986 (the "Act"), 42 U.S.C. 11101-11152 (1988 & Supp. IV 1992). It also found that Dr. Mathews failed to produce evidence of concerted action and antitrust injury. The district court entered summary judgment against Dr. Mathews on his antitrust claims and dismissed his pendant state law claims. See Opinion and Order, Mathews v. Lancaster Gen. Hosp., Nos. 93-6774, 94-4647 (E.D. Pa. May 4, 1995).

Dr. Mathews appeals the grant of immunity, and defendants cross-appeal the denial of their motion for attorneys' fees. The Act requires that "a professional review action be taken in the reasonable belief that the action was in furtherance of quality health care" for immunity to attach. 42 U.S.C. 11112(a)(1). Because the evidence in this case supports the conclusion that defendants possessed a reasonable belief that their action was in furtherance of quality health care, we believe the district court correctly found them to be immune from suit. We also hold that the award of attorneys' fees to prevailing defendants under the Act lies in the discretion of the district court.

Dr. Mathews also challenges the district court's grant of summary judgment on the antitrust claims. We believe Dr. Mathews has failed to raise a genuine issue of material fact as to whether defendants engaged in concerted action in restraint of trade. Nor has he shown the existence of an antitrust injury. We will affirm.

I. Factual Background

Dr. Robert Mathews is an orthopedic surgeon who has been on the staff of Lancaster General Hospital ("Lancaster General") since 1973 and Columbia Hospital ("Columbia") since 1992. He practices as a corporate partner with another orthopedic surgeon, Dr. George Kent. Lancaster General, Columbia, and affiliated corporate entities, the Lancaster General Hospital Foundation and the Columbia Hospital Foundation, are defendants in this antitrust suit. Also defendants are Orthopedics Associates of Lancaster, Ltd. ("Orthopedic Associates"), an orthopedic surgery group practice in competition with Dr. Mathews' practice, and several doctors, including Drs. Gerald Rothacker, Jr., Thomas Westphal, and John Shertzer, all orthopedic surgeons and shareholders of Orthopedic Associates. Dr. Mathews alleges that Lancaster General, Columbia, Orthopedic Associates, and the individual defendants engaged in an antitrust conspiracy to curtail his orthopedics practice and his privileges at Lancaster General by improperly sanctioning him in a peer review proceeding. He alleges that Dr. J. Paul Lyet, another orthopedic surgeon, Dr. James Argires, a neurosurgeon and a member of the Lancaster General Hospital Board of Directors, and Dr. Hugh Hoke, a former President of the Medical and Dental Staff of Lancaster General Hospital and ex-officio member of the Lancaster General Hospital Board, also participated in the conspiracy.

The chain of events that precipitated this lawsuit began on December 27, 1989. That morning, Dr. Kent was performing spinal surgery at Lancaster General. Dr. Mathews was listed as a co-surgeon for the operation. During the procedure, a high speed drill slipped and tore the patient's esophagus. Dr. Kent attempted to repair the esophagus himself without seeking outside assistance or a consultation. Dr. Mathews was not present in the operating room when the esophagus was injured. Later that evening, the patient suffered complications necessitating emergency surgery to repair the tear.

After the accident, Dr. Kent's hospital privileges were suspended for five days while an ad hoc committee, chaired by Dr. Hoke and composed of several other Lancaster General physicians (the "Hoke Committee"), investigated. The Hoke Committee concluded that Dr. Kent had acted inappropriately by failing to seek a consultation on the patient's torn esophagus. In a report dated January 4, 1990, the Hoke Committee recommended a focused review of Dr. Kent's cases for a prospective six month period by the Quality Assurance Committee of the Department of Surgery and urged that letters of reprimand be placed in the confidential files of both Drs. Kent and Mathews. The report concluded that Dr. Mathews, as co-surgeon, bore some responsibility for the incident.

In accordance with the Hoke Committee's recommendation, Dr. Robert Johnson, the President of the Medical and Dental Staff, authorized a second ad hoc committee of three board-certified orthopedic surgeons to conduct the six-month focused review of Dr. Kent's cases. The committee was selected by Dr. Rothacker, Chairman of the Department of Surgery at Lancaster General, and consisted of Drs. Rothacker, Westphal and Lyet (the

"Rothacker Committee").  The parties dispute why the focused review was not undertaken by the Quality Assurance Committee as the Hoke Committee had recommended.  Drs. Rothacker and Westphal are both shareholders of Orthopedic Associates and economic competitors of Dr. Mathews.

The Rothacker Committee reviewed 208 surgical cases in which Dr. Kent served as either the primary or assisting surgeon. Apparently Dr. Rothacker played the most important role in the review.  At the end of the review which took two years, the committee concluded that 27 of the 208 cases evidenced a substandard level of care.  Twenty-three of those cases, the committee discovered, involved spine surgery, and Dr. Mathews had been the primary surgeon in each of those cases.  Dr. Rothacker reported the findings of the committee to Dr. Johnson in a March 19, 1992 letter.  In the letter, Dr. Rothacker recommended that the 27 files rated substandard by the committee be sent to an outside agency for further review, and "[i]f this agency agrees that these cases were not managed in an acceptable fashion, a restriction of privileges would be indicated."  Both Dr. Kent and Dr. Mathews were sent copies of the letter.  Dr. Rothacker also reported the conclusions of his committee to the Executive Committee of the Medical and Dental Staff on April 6, 1992, although he did not provide the Executive Committee with any underlying materials or with the Hoke Committee report. Subsequently, in a letter dated April 30, 1992, Dr. Johnson informed Dr. Mathews that an independent reviewer would evaluate both Dr. Mathews' and Dr. Kent's cases.  Attached to this letter was a copy of the minutes of the April 6, 1992 meeting of the Executive Committee, which stated in part:

> In a significant number of these cases [of Dr. Kent], Dr. Robert Mathews was also involved in the surgery, as primary or assistant surgeon.  Therefore, any review by an outside review agency will also involve a review [of] Dr. Mathews' performance in these cases, and may result in a recommendation regarding Dr. Mathews' clinical privileges.

At the time he was conducting the review of Dr. Kent's cases, Dr. Rothacker was also concerned about economic trends affecting the medical profession.  In a November 1991 letter to the Lancaster General Hospital Foundation Board, Dr. Rothacker wrote:  "The economic climate for medical practice, as you know, is not favorable at this time.  Most of us anticipate a significant drop in our gross earning ability and most likely our net earning ability."  In January 1993, in order to respond to negative economic trends, Orthopedic Associates, of which Dr. Rothacker was a principal, and Lancaster General formed a joint venture--the MidAtlantic Orthopedic Institute.  The Institute was intended "to develop, operate and market a comprehensive orthopedic care and orthopedic surgical services program, through [Lancaster General]."  Orthopedic Associates was to be the exclusive provider of orthopedic surgical services at the Institute, and Lancaster General agreed to dedicate operating room time and support personnel to Orthopedic Associates.  Dr.

Mathews was a major user of operating room time at Lancaster General.

Meanwhile, Lancaster General had retained the American Medico-Legal Foundation to select an independent reviewer to review the 27 cases in which the Rothacker Committee had found that Drs. Kent and Mathews had provided substandard care. The Foundation chose Philip D. Wilson, Jr., M.D., of Cornell Medical College. Dr. Wilson is a board certified orthopedic surgeon who has taught in the field of orthopedic surgery for over 40 years. Drs. Kent and Mathews were given an opportunity to submit additional information regarding the files to be sent to the independent reviewer, and both submitted some supplementary materials. On March 18, 1993, Dr. Wilson issued a report concluding the quality of care rendered by Drs. Kent and Mathews was inadequate and below acceptable standards. Dr. Wilson's report concluded:

> the pattern and trend of care reflected by review of the records of the 23 patients undergoing lumbar spinal surgery by these two surgeons in a period of 6 months are substandard in the following ways:
>
> (1) Incredibly poor documentation of patient work-ups lacking clear definition of primary complaints, clear histories of present illnesses, well recorded past medical histories, complete and orderly specific orthopedic and neurological examinations, and specifics of prior ambulatory care and treatments.
>
> (2) Lack of timely review, editing and correction of dictated and typed office notes.
>
> (3) Lack of timely signature to authorize such notes.
>
> (4) Poor use of consultants such as neurologists, neurosurgeons, and/or electroneurodiagnosticians.
>
> (5) Great dependence on literal and non-objective interpretations of CAT scans without direct clinical correlations for diagnosis.
>
> (6) Failure to use alternative imaging techniques such as the full spectrum of routine x-rays, MRIs, and myelographic enhanced CTs.
>
> (7) Lack of judgment in applying extensive lumbar surgical decompressions and fusions to

patients irrespective of age and type of condition.

(8) Lack of well controlled ambulatory non-operative techniques such as bracing, exercise therapy, pain blocks and physiotherapeutic modalities.

(9) Nonsystematic use of medications such as NSAIDs, muscle relaxants, analgesics, etc.

(10) Lack of objective hospitalization progress notes recording such details as progress of wound, recovery milestones, etc.

(11) The lack of a concise but descriptive discharge note with details of course as well as diagnoses, operative procedures and complications.

(12) Deficient operative notes without details of intraoperative findings and annotated justification for widespread and radical decompressive and stabilization procedures.

(13) Lack of understanding of principles for suitable internal fixation of the spine.

(14) Lack of observing suitable principles for optimal results from spinal arthrodesis grafting techniques.

Dr. Wilson recommended that both doctors' privileges to perform spine surgery be restricted until they were able to "demonstrate a renewed and updated understanding of present day principles and practice of this type of surgery." By letter dated May 10, 1993, Dr. Mathews was advised of Dr. Wilson's conclusions and furnished with a copy of his peer review report. The letter warned that any restriction of privileges would be reported to the National Practitioner Data Bank.

In July 1993, Dr. Mathews was negotiating with Lancaster General over the possible sale of a property adjacent to Lancaster General in which he held an interest. He sought to link those negotiations to the hospital's proposed actions regarding his privileges. Dr. Mathews believed an understanding had been reached with Lancaster General that he would sell the property and voluntarily cease to perform spine surgery, and Lancaster General would not submit an adverse report to the National Practitioner Data Bank. In accordance with his understanding, Dr. Mathews voluntarily did not request privileges for spine surgery in his 1994-95 staff privileges application to Lancaster General, submitted on July 29, 1993. But on August 27, 1993, Dr. Hoke wrote to Dr. Mathews rejecting the linkage of the sale of property and Dr. Mathews' staff privileges.

On September 16, 1993, the Lancaster General Hospital Board of Directors voted to restrict Dr. Mathews' privileges to perform spine surgery as either primary or assisting surgeon. They also voted to require Dr. Mathews to obtain a second opinion or consultation before performing prosthetic joint surgery, arthroscopy, or hand or foot surgery for a period of 12 months. Dr. Shertzer (a partner in Orthopedic Associates), Dr. Argires, and Dr. Hoke abstained from voting, although they were members of the Board. The Board notified Dr. Mathews of its decision by letter dated September 22, 1993 and informed him of his right to a fair hearing under Lancaster General Hospital Medical Staff Bylaws. On October 26, 1993, Dr. Mathews requested a hearing, and the Board subsequently voted to suspend the restrictions on his privileges until a hearing could be held. Before the hearing was scheduled, however, Dr. Mathews filed this suit.

During this course of events, Dr. Mathews also applied for staff privileges at Columbia Hospital. Columbia granted Dr. Mathews "temporary privileges" in the Division of Surgery, Orthopedics, effective April 22, 1992. Later that year, Dr. Mathews was granted "provisional courtesy privileges" for a period of twelve months. Near the end of that period, on August 25, 1993, Columbia's Credentials Committee recommended that Dr. Mathews' privileges be upgraded to "courtesy privileges," and Columbia upgraded Dr. Mathews' status the next month. Dr. Mathews submitted a reappointment application to have his privileges at Columbia renewed for the year beginning January 1, 1994, but in the course of reviewing Dr. Mathews' application, Mr. Robert Katana, President and CEO of Columbia Hospital, discovered the application did not contain a reappointment reference from Lancaster General. Columbia requires all staff physicians to submit a reappointment reference from any other hospital where they exercise privileges, and Mr. Katana requested such a reference from Dr. Mathews. Dr. Mathews never submitted the reappointment reference from Lancaster General, and his courtesy staff privileges at Columbia expired on December 31, 1993. Thereafter, Columbia granted Dr. Mathews "temporary privileges." In September 1993, at the time Mr. Katana was considering Dr. Mathews' application for an extension of privileges, Lancaster General was in the process of negotiating a merger with Columbia Hospital.

## II. Procedural History

Dr. Mathews brought suit against Lancaster General Hospital, Columbia Hospital, and various staff members of Lancaster General on December 15, 1993, and against Orthopedic Associates of Lancaster, Ltd. on August 1, 1994. The two cases were consolidated. The district court granted summary judgment to Lancaster General, Orthopedic Associates, and the individual defendants on federal and state claims for monetary relief because it found they enjoyed immunity from monetary damages under  11111(a) of the Health Care Quality Improvement Act. The district court also granted summary judgment to all defendants, including Columbia, on Dr. Mathews' antitrust claims, holding he had not produced evidence showing concerted action on the part of the defendants or an antitrust injury. The district court

entered summary judgment on Dr. Mathews' federal claims for injunctive relief and dismissed without prejudice state claims for injunctive relief. See Opinion and Order, Mathews v. Lancaster Gen. Hosp., Nos. 93-6774, 94-4647 (E.D. Pa. May 4, 1995) ("Opinion and Order"). Mathews appeals the district court's grant of summary judgment. All defendants except Columbia appeal the district court's refusal to grant attorneys' fees.

We have jurisdiction under 28 U.S.C. 1291 to review the district court's final order. Our review of the district court's grant of summary judgment is plenary. Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir.), cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc., 114 S. Ct. 554 (1993).

### III. The Health Care Quality Improvement Act

This case arises under the Health Care Quality Improvement Act of 1986, 42 U.S.C. 11101-11152 (1988 & Supp. IV 1992). Congress passed the Act "to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior." H.R. Rep. No. 903, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 6287, 6384, 6384. Congress believed incompetent physicians could be identified through "effective professional peer review," which it chose to encourage by granting limited immunity from suits for money damages to participants in professional peer review actions. 42 U.S.C. 11101(5), 11111(a). Congress also sought "to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance" by creating an obligation to report professional review sanctions to the Secretary of the Department of Health and Human Services. 42 U.S.C. 11101(2), 11134.

The standards that a professional review action must satisfy in order to entitle participants in the review process to immunity are set forth in 42 U.S.C. 11112(a) and include certain fairness and due process requirements. For immunity to attach, the results of the action must be reported to the State Board of Medical Examiners in compliance with 42 U.S.C. 11133.

The Act was intended to deter antitrust suits by disciplined physicians. Congress believed "[t]he threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review." 42 U.S.C. 11101(4). The Act contains a fee shifting provision to discourage frivolous suits by physicians disciplined in peer review proceedings. See 42 U.S.C. 11113.

The Act includes a presumption that a professional review activity meets the standards for immunity, "unless the presumption is rebutted by a preponderance of the evidence." 42 U.S.C. 11112(a). This presumption results in an "unusual standard" for reviewing summary judgment orders under the Act. "In a sense, the presumption language in [the Health Care Quality

Improvement Act] means that the plaintiff bears the burden of proving that the peer review process was not reasonable." Bryan v. James E. Holmes Regional Medical Ctr., 33 F.3d 1318, 1333 (11th Cir. 1994) (emphasis in original), cert. denied, 115 S. Ct. 1363 (1995). "We must examine the record in this case to determine whether [Dr. Mathews] satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of the [Act]." Id. at 1334; see also Austin v. McNamara, 979 F.2d 728, 734 (9th Cir. 1992) (same).

A. Professional Review Actions under the Act

Dr. Mathews argues Lancaster General and defendant physicians conducted at least two "professional review actions" relating to him: first, the March 19, 1992 letter of Dr. Rothacker on behalf of the Rothacker Committee recommending a focused review of his cases and a possible restriction of his privileges, and second, the September 16, 1993 vote by the Lancaster General Hospital Board of Directors to revoke his spine privileges. The Act defines a "professional review action" as:

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity . . . which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of a physician. Such term . . . also includes professional review activities relating to a professional review action.

42 U.S.C. 11151(9). Dr. Mathews contends that Dr. Rothacker's March 19, 1992 letter constituted a professional review action because it made a recommendation that had the potential to adversely affect his clinical privileges. He argues the district court erred by not treating the Rothacker Committee's letter as a professional review action and not assessing it for compliance with the fairness and procedural standards outlined in 42 U.S.C. 11112(a).

The district court, reading the definitions of "professional review action" and "professional review activity" together, concluded that "the term `professional review activity' refers to preliminary investigative measures taken in a `reasonable effort to obtain the facts' relevant to a possible change in a physician's privileges, while the term `professional review action' refers to the decision that results from a review of the facts obtained." See Opinion and Order, slip op. at 21. It concluded Dr. Rothacker's letter was a part of the preliminary investigative process and therefore not a "professional review action." We agree with the district court's analysis.

The definition of "professional review action" encompasses decisions or recommendations by peer review bodies that directly curtail a physician's clinical privileges or impose some lesser sanction that may eventually affect a physician's

privileges.  "Professional review actions" do not include a decision or recommendation to monitor the standard of care provided by a physician or factfinding to ascertain whether a physician has provided adequate care.  These are "professional review activities."  See Fobbs v. Holy Cross Health Sys. Corp., 789 F. Supp. 1054, 1065 (E.D. Cal. 1992) ("[P]rofessional review activity means the investigative process during and/or upon which a professional review action, i.e., a decision, is made."), aff'd, 29 F.3d 1439 (9th Cir. 1994), cert. denied, 115 S. Ct. 936 (1995).  We believe Dr. Rothacker's March 12, 1992 letter was a part of ongoing professional review activities.  It did not constitute a decision to restrict Dr. Mathews' privileges, nor did it recommend that Dr. Mathews' privileges be restricted immediately.  In fact, the letter did not impose any penalty.  Instead, it recommended further investigation and review by an outside agency before any limitations were placed on Dr. Mathews' privileges. No professional review action occurred here until the Board's September 16, 1993 vote to suspend Dr. Mathews' privileges.  See Austin v. McNamara, 979 F.2d at 736 ("no `action' was taken in this case until . . . the first occasion when [plaintiff's] clinical privileges were adversely affected. Prior to that time, he had been monitored and reviewed, but no professional review body had limited his clinical privileges or adopted a recommendation that they be limited.").  Because Dr. Rothacker's March 19, 1992 letter was not a professional review action, the district court correctly held it did not have to meet the standards set forth in 42 U.S.C.  11112(a).

### B.  Immunity under the Act

Dr. Mathews contends summary judgment was inappropriate because there were disputed issues of fact as to whether the defendants met the standard for immunity set forth in 42 U.S.C. 11112(a).  For immunity under  11111(a) to attach, four requirements must be met.  The professional review action must be taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C.  11112(a).  We will undertake the inquiry mandated by each of  11112(a)'s four prongs to determine whether the district court's grant of summary judgment on the basis of immunity was proper.

1.  Reasonable Belief that the Action was in the

Furtherance of Quality Health Care

On appeal, Dr. Mathews argues he raised material issues of fact as to whether participants in the peer review proceedings at Lancaster General acted "in the reasonable belief that [a restriction of his privileges] was in the furtherance of quality health care," as is required under  11112(a)(1) of the Act.  He maintains that defendants were in direct economic competition with him, which supports an inference of their bad faith.  The district court held that  11112(a)(1) mandates an objective standard, and "assertions of bad faith and anticompetitive motive are irrelevant to the question of whether a decision was taken in a reasonable belief that it would further quality health care." Opinion and Order, slip op. at 29-30.

Other courts of appeals, in evaluating summary judgment orders granted on the basis of immunity, have uniformly applied an objective standard in assessing compliance with  11112(a). See Imperial v. Suburban Hosp. Ass'n, Inc., 37 F.3d 1026, 1030 (4th Cir. 1994) ("The standard is an objective one which looks to the totality of the circumstances."); Smith v. Ricks, 31 F.3d 1478, 1485 (9th Cir. 1994) ("the `reasonableness' requirements of  11112(a) were intended to create an objective standard, rather than a subjective standard"), cert. denied, 115 S. Ct. 1400 (1995).  They have held that a defendant's subjective bad faith is irrelevant under  11112(a) and have upheld a finding of immunity if, on the basis of the record, the court could conclude that the professional review action would further quality health care.  See, e.g., Bryan v. James E. Holmes Regional Medical Ctr., 33 F.3d 1318, 1335 (11th Cir. 1994) (Plaintiff's "assertions of hostility do not support his position [that the hospital is not entitled to the Act's protections] because they are irrelevant to the reasonableness standards of  11112(a).  The test is an objective one, so bad faith is immaterial.  The real issue is the sufficiency of the basis for the [Hospital's] actions."), cert. denied, 115 S. Ct. 1363 (1995); Austin v. McNamara, 979 F.2d 728, 734 (9th Cir. 1992) (same); see also Opinion and Order, slip op. at 30.

We agree with our sister circuits that  11112(a) imposes an objective standard.  The House Committee on Energy and Commerce's report on the Act stated with regard to  11112(a)(1):

> Initially, the Committee considered a "good
> faith" standard for professional review
> actions.  In response to concerns that "good
> faith" might be misinterpreted as requiring
> only a test of the subjective state of mind
> of the physicians conducting the professional
> review action, the Committee changed to a
> more objective "reasonable belief" standard.

H.R. Rep. No. 903, 99th Cong., 2d Sess. 10 (1986), reprinted in1986 U.S.C.C.A.N. at 6392-93.  Although the quoted passage relates to a previous version of the Act and to  11112(a)(1) in particular, we believe that Congress' use of the words "reasonable belief" in both  11112(a)(1) and (4) indicates an intention to create an objective standard with regard to 11112(a) as a whole.  Under  11112(a)(1), this standard "will

be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients."  H.R. Rep. No. 903, 99th Cong., 2d Sess. 10 (1986), reprinted in 1986 U.S.C.C.A.N. at 6393.  The court should look to the totality of the circumstances.  Imperial v. Suburban Hosp. Ass'n, Inc., 37 F.3d at 1030.

Dr. Mathews has presented evidence that defendants, including Lancaster General as a joint venturer in the MidAtlantic Orthopedic Institute, were his competitors.  But he has not presented evidence that the professional review action taken by Lancaster General's Board was motivated by anything other than a reasonable belief that it would further quality health care.  As the district court concluded after carefully reviewing the evidence, Dr. Mathews has failed to rebut 11112(a)'s presumption that the peer reviewers' action met the standard for immunity from suit for monetary damages:

> The undisputed evidence shows that, in making its decision, the Board relied on the findings of the Rothacker Committee and the independent expert Dr. Wilson, as reported to the Board by LGH CEO Mr. Young and defendant Dr. Hoke.  The Rothacker Committee report represents the conclusion of a committee of three board certified orthopedic surgeons that 23 of Dr. Mathews' cases during a six-month period did not meet appropriate standards of care.  These findings were confirmed by those of the independent expert, Dr. Wilson of Cornell Medical College. . . .

> After reviewing the cases identified by the Rothacker Committee, Dr. Wilson submitted a detailed report in which he concluded that the pattern and trend of care reflected were "substandard" in fourteen separate respects, which he enumerated. . . . The restrictions voted on by the Board appear tailored to meet the concerns raised by Dr. Wilson's report. Thus, in addition to the statutory presumption in favor of defendants, the evidentiary record in this case provides ample support for the conclusion that the Board's action was taken in a reasonable belief that it would further quality health care. . . .

> Dr. Mathews has produced no evidence that anticompetitive considerations actually entered into the Board's decisionmaking process. . . . There is no evidence that the reports contained or that the Board considered any supporting evidence that was

not related to the quality of health care. Rather, Dr. Mathews appears to base his argument solely on his allegation that the defendants were his competitors and stood to gain by eliminating him from the market.

Mere participation by plaintiff's competitors in the Hoke or Rothacker Committee investigations or the Board's vote, however, does not run afoul of the [Health Care Quality Improvement Act]. Although the Act suggests that a hearing officer or individuals sitting on a hearing panel should not be in direct competition with the physician who is the subject of the hearing, see 11112(b)(3)(A)(ii) & (iii), it imposes no such requirement on participants in other phases of the peer review process. To the extent plaintiff is attempting to suggest that it was not reasonable for the Board to rely on the Rothacker report because it was generated by orthopedic surgeons who are plaintiff's competitors, this contention is negated by the fact that the committee's findings were confirmed by Dr. Wilson, who is not in any way in competition with Dr. Mathews. Moreover, we note that although the [Act] does not require it, the physician members of the Board, defendant Drs. Hoke, Argires, and Shertzer, abstained from voting on the privilege restrictions. Thus plaintiff's arguments concerning his competitors' participation in the peer review process cannot serve to rebut the presumption in favor of defendants.

Opinion and Order, slip op. at 28-32. Because Dr. Mathews has not rebutted the presumption that defendants' actions were taken in the reasonable belief that they would further quality health care, and, in fact, the evidence supports the conclusion that defendants were motivated by legitimate health care concerns, the district court correctly found defendants met the requirements of the first prong of 11112(a) of the Act.

2. Reasonable Effort to Obtain the Facts

Dr. Mathews also argues that defendants did not engage in a reasonable effort to obtain the facts under 11112(a)(2) of the Act. He points to several problems in the factfinding process, specifically that the Rothacker Committee was composed of competitors, did not request formal authorization to begin a focused review of Dr. Mathews' cases, and did not reveal to the Board the extent of participation in the review process of each member of the committee. Dr. Mathews also emphasizes the Board did not undertake an independent investigation and did not consider Lancaster General routine internal quality reviews. Contrast Imperial v. Suburban Hosp. Ass'n, Inc., 862 F. Supp.

1390, 1399 (D. Md. 1993) (Board questioned plaintiff's attorney and reviewed records), aff'd, 37 F.3d 1026 (4th Cir. 1994).

Although Dr. Mathews challenges the integrity of the Rothacker Committee, he has not rebutted the presumption that defendants engaged in a reasonable effort to obtain the facts. The investigation of the Rothacker Committee, as a preliminary, investigative "professional review activity," was not required independently to meet the requirements of 11112(a). See suprapart III.A. The Act contains no provision barring competitors from participating in "professional review activities." Nor does it require formal authorization for preliminary "professional review activities." Moreover, it is undisputed that Dr. Mathews' standard of care became the focus of attention during the Rothacker Committee's review of Dr. Kent's cases, which necessarily encompassed the cases of Dr. Mathews.

The relevant inquiry under 11112(a)(2) is whether the totality of the process leading up to the Board's "professional review action" on September 16, 1993 evidenced a reasonable effort to obtain the facts of the matter. The Board relied on the recommendations of two separate reviews. The initial review by the Rothacker Committee took over two years to complete and reviewed 208 cases. The second review was performed by an independent outside reviewer retained by Lancaster General. The outside reviewer, Dr. Wilson, confirmed the findings of the Rothacker Committee. The district court correctly concluded that Dr. Mathews has not overcome the presumption that the Board undertook reasonable efforts to obtain the facts of the matter in compliance with 11112(a)(2). See Opinion and Order, slip op. at 38.

3. Adequate Notice and Hearing Procedures

Dr. Mathews does not contest on appeal that Lancaster General and the defendant individual physicians afforded him adequate notice and hearing procedures in accordance with 11112(a)(3) of the Act. A review of the record confirms defendants complied with 11112(a)(3).

Dr. Mathews was given notice of the progress of the professional review activities at each step. A copy of the March 19, 1992 letter of the Rothacker Committee was sent to Dr. Mathews at the same time its conclusions were reported to the Medical and Dental Staff. On April 30, 1992, Dr. Johnson sent a letter to Dr. Mathews informing him that an outside reviewer would review the 27 cases identified by the Rothacker Committee. This letter included minutes of the Medical and Dental Staff Executive Committee meeting, in which the Executive Committee indicated that the outside review "may result in a recommendation regarding Dr. Mathews' clinical privileges." Before the outside reviewer, Dr. Wilson, commenced his review, Dr. Mathews was given the opportunity to provide additional materials, and he did so. Dr. Mathews was provided with a copy of Dr. Wilson's March 18, 1993 report. Lancaster General informed Dr. Mathews that it was considering placing restrictions on his privileges and it gave Dr. Mathews the opportunity to respond informally. After the Board voted to restrict Dr. Mathews' privileges on September 16, 1993, Dr. Young informed Dr. Mathews of the Board's decision by

letter dated September 22, 1993.  The letter informed Dr. Mathews of his right to request a hearing, stated the time limit for doing so, and provided a summary of the rights he would be afforded at the hearing.  The letter also stated that Dr. Mathews would be provided the procedural safeguards set for forth in the Act.

After Dr. Mathews requested a hearing, the Board suspended the proposed restrictions until the hearing could be held.  Shortly thereafter, Dr. Mathews filed this suit, short-circuiting the completion of the review procedures called for by 11112(b)(3).  Even though the hearing has never been held, Lancaster General complied with the safe harbor provision, 11112(b), in all respects until the time when Dr. Mathews filed suit.  In fact, Lancaster General provided Dr. Mathews with additional notices and procedural rights during the conduct of preliminary professional review activities that were not required by the Act.  We do not believe a plaintiff can deprive defendants of immunity by refusing to participate in the hearing required under  11112(b)(3).  Accordingly, we conclude Dr. Mathews has not raised a material issue of fact rebutting the presumption that defendants complied with  11112(a)(3) of the Act.

4.    Reasonable Belief that the Action was Warranted by the Facts Known

Finally, Dr. Mathews disputes whether the Board's professional review action against him was taken in the reasonable belief that it "was warranted by the facts known," as required under  11112(a)(4) of the Act.

Dr. Wilson, the outside reviewer, concluded that Dr. Mathews had provided substandard care in spine surgery cases.  The Board then placed restrictions on Dr. Mathews' privileges to conduct spine surgery.  Because these restrictions were tailored to address the health care concerns raised by the reports of the Rothacker Committee and Dr. Wilson, we believe the evidence supports the conclusion that the restrictions were imposed based on a reasonable belief that they were warranted by the facts known.  Moreover, Dr. Mathews has produced insufficient evidence to rebut the presumption that the Board's action was taken in the reasonable belief that it was warranted.  As we have noted, Dr. Mathews relies on the opinion provided by his expert witness, Dr. Goldner, who disagreed with Dr. Wilson's conclusions.  While the conflicting expert reports raise an issue of fact as to the adequacy of care provided by Dr. Mathews, they do not rebut the presumption that the Board made its decision in the reasonable belief that it was warranted by the facts known.  The conclusions of Dr. Goldner's report were not among "the facts known" at the time of the professional review action.  Furthermore, the Rothacker Committee report and the report of Dr. Wilson were not so obviously mistaken or inadequate as to make reliance on them unreasonable.  The requirements of  11112(a)(4) have been met as well.

5.    Summary on Immunity under the Act

We hold  11112(a) of the Act imposes an objective standard. Under  11112(a)(1), this standard is met when peer reviewers reasonably conclude that their actions will restrict

incompetent behavior or protect patients.  Because the record supports the district court's holding that Lancaster General and the individual defendants reasonably believed their actions would further quality health care and also fulfilled the remaining three prongs of  11112(a) of the Act, we will affirm the district court's judgment that defendants are immune from suit for monetary damages.

## IV.  Antitrust Claims

Dr. Mathews alleges Lancaster General, Orthopedic Associates, Columbia and the individual defendants conspired to conduct a sham peer review investigation and to restrict his privileges at Lancaster General and Columbia.  He argues the defendants' conspiracy violated  1 of the Sherman Act, entitling him to treble damages under 15 U.S.C.  15 (1994) and to injunctive relief under 15 U.S.C.  26.  Although several of the defendants are immune from money damages under the Health Care Quality Improvement Act, we must still examine Dr. Mathews' antitrust claims in order to determine whether he is entitled to injunctive relief.  The district court granted summary judgment to all defendants on the antitrust claims.

Our review of a grant of summary judgment is plenary. Summary judgment must be granted where no genuine issue of material fact exists for resolution at trial and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing the absence of any genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof at trial, the moving party may meet its burden by showing that the nonmoving party has not offered evidence sufficient to establish the existence of an element essential to its case.  Id. at 322.

Section 1 of the Sherman Act provides:

> Every contract, combination in the form of
> trust or otherwise, or conspiracy, in
> restraint of trade or commerce among the
> several States, or with foreign nations, is
> declared to be illegal.

15 U.S.C.  1.  To establish a section 1 violation, a plaintiff must prove:

> (1) concerted action by the defendants; (2)
> that produced anticompetitive effects within
> the relevant product and geographic markets;
> (3) that the concerted actions were illegal;
> and (4) that it was injured as a proximate
> result of the concerted action.

Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1229 (3d Cir.), cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc., 114 S. Ct. 554 (1993). The district court granted summary judgment to defendants, holding that Dr. Mathews had not presented sufficient evidence of concerted action and antitrust injury.

### A.  Concerted Action

"The very essence of a section 1 claim, of course, is the existence of an agreement."  Alvord-Polk, Inc. v. F.

Schumacher & Co., 37 F.3d 996, 999 (3d Cir. 1994), cert. denied, 115 S. Ct. 1691 (1995). For a section 1 claim, "a plaintiff must prove `concerted action,' a collective reference to the `contract . . . combination or conspiracy.'" Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1131 (3d Cir. 1995). A "`unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement' must exist to trigger section 1 liability." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984) (quoting American Tobacco Co. v. United States, 328 U.S. 781, 810 (1946)). "Unilateral action, no matter what its motivation, cannot violate [section] 1." Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 110 (3d Cir. 1980), cert. denied, 451 U.S. 911 (1981).

The district court concluded the Board acted independently and not in concert with Orthopedic Associates or the individual defendants in taking the professional review action against Dr. Mathews. See Opinion and Order, slip op. at 50–54. We believe the evidence supports the district court's conclusion. It is undisputed that only the Board had the authority to restrict Dr. Mathews' privileges. Where a hospital board has ultimate decision making authority, "[s]imply making a peer review recommendation does not prove the existence of a conspiracy [among the hospital and its staff]; there must be something more such as a conscious commitment by the medical staff to coerce the hospital into accepting its recommendation." Oksanen v. Page Memorial Hosp., 945 F.2d 696, 706 (4th Cir. 1991), cert. denied, 502 U.S. 1074 (1992); see also Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1459 (11th Cir. 1991) ("[T]hat the hospital board had before it recommendations from the medical staff and the radiologists were pleased with [the hospital's] ultimate decision is, standing alone, insufficient to infer an antitrust conspiracy."). Dr. Mathews has not raised a genuine issue of material fact as to whether Orthopedic Associates or Drs. Rothacker, Westphal, Shertzer, Lyet, Argires and Hoke coerced or lobbied the Board to restrict Dr. Mathews' privileges.

Dr. Mathews views the activities of the Rothacker Committee as evidence of a campaign of its members, Drs. Rothacker, Westphal, and Lyet, to restrict his privileges. The Rothacker Committee's recommendation was made eighteen months before the Board's vote. There is no evidence that any doctor on the Rothacker Committee had any further connection with the peer review process thereafter. Moreover, the Rothacker Committee suggested further review of Dr. Mathews' cases by an outside reviewer. These facts negate an inference that the Rothacker Committee or its members were attempting to coerce the Board into restricting Dr. Mathews' privileges.

Dr. Mathews also points out the presence of Drs. Shertzer, Argires, and Hoke during the Board's vote to restrict his privileges. We do not believe the defendants' presence gives rise to an inference of an antitrust conspiracy. All the defendants abstained from voting, and Dr. Mathews has presented no evidence that defendants attempted to influence or lobby the Board.

Dr. Mathews argues that the contractual relationship between Lancaster General and Orthopedic Associates relating to the MidAtlantic Orthopedic Institute supports an inference that Orthopedic Associates and members of Orthopedic Associates, Drs. Rothacker, Westphal, and Shertzer, unduly influenced the Board. Although a contractual relationship might support an inference that Orthopedic Associates may have had the power to influence the Board's decision, Dr. Mathews has not produced any evidence that such coercion actually occurred.

Moreover, we believe peer review actions, when properly conducted, generally enhance competition and improve the quality of medical care. See Weiss v. York Hosp., 745 F.2d 786, 821 n.60 (3d Cir. 1984) ("it seems obvious that by restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of medical care it delivers. Thus such action is pro-competitive"), cert. denied, 470 U.S. 1060 (1985); Oksanen v. Page Memorial Hosp., 945 F.2d at 709 ("[T]he peer review process, by policing competence and conduct of doctors, can enhance competition."). We are reluctant to draw inferences of an antitrust conspiracy from ambiguous circumstantial evidence in cases where the challenged activity promotes competition. Evidence of conduct, which is "as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 597 n.21 (1986); see also Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d at 1001. "[T]here must be evidence that tends to exclude the possibility of independent action." Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 768 (1984).

Substantial evidence supports the conclusion that the Board voted to restrict Dr. Mathews' privileges for legitimate health care reasons. The Board relied on the report of the independent reviewer, Dr. Wilson, in addition to Lancaster General's own internal review procedure conducted by the Rothacker Committee. Although Dr. Mathews has produced some circumstantial evidence of an economic motivation on the part of defendants, the evidence he refers to is equally consistent with permissible competition and the promotion of quality patient care. Dr. Mathews has not produced evidence that tends to exclude the possibility that the Board acted independently. Under these circumstances, we are reluctant to infer an antitrust conspiracy, and we believe the district court correctly granted summary judgment to Lancaster General and the individual defendants. Cf. Willman v. Heartland Hospital East, 34 F.3d 605, 611 (8th Cir. 1994) ("the limitation and eventual termination of [plaintiff's] staff privileges . . . is as consistent with the lawful motive of promoting quality patient care as with an anticompetitive motive and therefore, without more, does not give rise to an inference of an antitrust conspiracy"), cert. denied, 115 S. Ct. 1361 (1995).

Dr. Mathews also has not produced sufficient evidence of concerted action on the part of Lancaster General and Columbia Hospital to survive summary judgment. While it is true that

Lancaster General and Columbia were conducting merger negotiations at the time of Dr. Mathews' application for a renewal of privileges, the undisputed facts establish that Columbia reduced Dr. Mathews' privileges from courtesy privileges to temporary privileges in the course of its normal staff review processes and in accordance with its own bylaws. Because Columbia's reduction of Dr. Mathews' privileges was as consistent with the lawful motive of following its bylaws as with an anticompetitive motive, we believe the evidence does not support an inference of an antitrust conspiracy. Id. We will affirm the district court's grant of summary judgment to Columbia Hospital as well.

### B. Antitrust Injury

The district court entered summary judgment for defendants on the alternative ground that Dr. Mathews had not produced evidence raising an issue of material fact as to the existence of an antitrust injury. In antitrust cases, a plaintiff must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours and Co., 826 F.2d 1235, 1240 (3d Cir. 1987) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)), cert. denied, 486 U.S. 1059 (1988). In other words, because "antitrust law aims to protect competition, not competitors, [a court] must analyze the antitrust injury question from the viewpoint of the consumer." Id. at 1241. "An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services," not just his own welfare. Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1991), cert. denied, 505 U.S. 1221 (1992).

The district court found the evidence does not support the existence of an antitrust injury resulting from a restriction on Dr. Mathews' privileges at Lancaster General because orthopedic services are still readily available to consumers in the Lancaster area from a large and ever-increasing number of providers. Opinion and Order, slip op. at 21. The district court also pointed out that the Board's restrictions on Dr. Mathews' privileges do not completely extinguish Dr. Mathews' ability to provide low cost services, but merely curtail his ability to perform spine surgery at Lancaster General. We believe the record supports the district court's conclusions. Accordingly, the district court's grant of summary judgment was proper.

### V. Attorneys' Fees under the Health Care Quality Improvement Act

Lancaster General, Orthopedic Associates, and the individual defendants argue the district court should have awarded them attorneys fees under the Health Care Quality Improvement Act's fee shifting provision, 42 U.S.C. 11113. They assert the award of attorneys' fees to prevailing defendants is mandatory under the Act. We disagree. "[T]he appropriate standard of review of a district court's decision regarding the award of attorney fees and costs under the [Act] is abuse of discretion." Muzquiz v. W.A. Foote Memorial Hosp., Inc., 70 F.3d 422, 431-32 (6th Cir. 1995); see also Smith v. Ricks, 31 F.3d

1478, 1487 (9th Cir. 1994), cert. denied, 115 S. Ct. 1400 (1995); Johnson v. Nyack Hosp., 964 F.2d 116, 123 (2d Cir. 1992).

To recover under 11113 "defendants must establish (1) that they are among the persons covered by 11111; (2) that the standards set in 11112(a) were followed; (3) that they substantially prevailed; and (4) that [plaintiff's] claims or conduct during the litigation were frivolous, unreasonable, without foundation or in bad faith." Wei v. Bodner, 1992 WL 165860 at *2 (D. N.J.). Defendants have concededly established the first three elements. The district court denied fees on the grounds that Dr. Mathews' suit was not "frivolous, unreasonable, without foundation or in bad faith." It concluded, "[t]he majority of the case law was not sufficiently established for us to say that plaintiff's claim was frivolous, unreasonable, without foundation, or in bad faith." It also noted that "[n]ot all of the facts were known to plaintiff at the filing of this case," and "[p]laintiff's state law claims were dismissed without prejudice." See Order, Mathews v. Lancaster Gen. Hosp., Nos. 93–6774, 94–4647 (June 9, 1995).

We believe that "it is important . . . [to] resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." Muzquiz v. W.A. Foote Memorial Hosp., Inc., 70 F.3d at 432.

The district court carefully considered whether Dr. Mathews' suit was frivolous, unreasonable, without foundation, or in bad faith. It correctly pointed out the dearth of case law on the Act at the time Dr. Mathews filed suit. We conclude the district court did not abuse its discretion in refusing to award attorneys' fees.

## VI. Conclusion

For the foregoing reasons, we will affirm the judgment of the district court.