OPINION
This case is before the court pursuant to the appeal of Dr. Venu Menon from the dismissal of his action against Stouder Memorial Hospital (Stouder) and Upper Valley Medical Centers (Upper Valley). Dr. Menon's claims arise from Stouder's denial of his application for reappointment to the medical staff. In support of his appeal, Dr. Menon has raised the following four assignments of error:
I. The trial court erred in granting summary judgment because the record contained evidence sufficient to create a genuine issue of material fact over whether Defendants-Appellees arbitrarily, capriciously and discriminatorily denied Plaintiff-Appellant's staff privileges such that judgment as a matter of law was inappropriate.
II. The trial court erred in granting summary judgment based on Defendants-Appellees being entitled to immunity under the Health Care Qualified Immunity Act of 1986.
III. The trial court erred by granting summary judgment on Plaintiff-Appellant's constitutional claims without affording the opportunity to conduct further discovery.
IV. The trial court erred in determining that there existed insufficient evidence in the record that Plaintiff-Appellant was denied procedural due process.
After reviewing the entire record, including the transcript of Dr. Menon's hearing and the exhibits introduced at the hearing, we find no error in the trial court's grant of summary judgment. Because our decision is primarily based on the defendants' immunity, we will first address the second assignment of error, which deals with that issue. *Page 3 
In the second assignment of error, Dr. Menon contends that the hospital did not meet the requirements for immunity under the Health Care Quality Improvement Act (HCQIA). Additionally, Dr. Menon claims that even if the hospital is immune in terms of money damages, his request for reinstatement should survive.
HCQIA was enacted to promote effective peer review nationwide and to protect parties involved in the peer review process. Section 11101, Title 42, U.S. Code. Although HCQIA is a federal statute, it applies to state laws for actions taken after October 14, 1989. Section 11111(c), Title 42, U.S. Code. Therefore, since the denial of Dr. Menon's privileges took place in 1993, the protections set forth in HCQIA would apply to this case.
With regard to immunity, Section 11111(a) provides as follows:
If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title * * *
 (A) the professional review body,
 (B) any person acting as a member or staff to the body,
 (C) any person under a contract or other formal agreement with the body, and
 (D) any person who participates with or assists the body with respect to the action,
 shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.
 Section 11151(9) then defines a "professional review action" as follows:
 [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients) and which affects (or may affect) adversely the clinical privileges or membership in a professional society, of a physician.
Further, under 11151(11): *Page 4 
 The term "professional review body" means a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity.
In the present case, Dr. Menon does not dispute that Stouder and the committees participating in his review fit within the definition of professional review body, nor does he contend that their actions were not a professional review action as defined in the statute. Moreover, with one exception that will be addressed later, Dr. Menon does not dispute that the hearings were procedurally adequate under Section 11112(b)(3)(C), Title 42 United States Code, so as to eliminate the defendants' money damage liability. Instead, as was noted, Dr. Menon's position is that Stouder's decision was not based on a reasonable belief that the action was being taken to further quality health care or in the reasonable belief that the action was warranted by the known facts. In this context, Section 11112 (a) provides the following standards for immunity:
 For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken-
 (1) in the reasonable belief that the action was in the furtherance of quality health care,
 (2) after a reasonable effort to obtain the facts of the matter,
 (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
 (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
 A professional review action shall be presumed to have met the preceding standards necessary of the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.
As specific evidence to rebut the above presumption, Dr. Menon points to *Page 5 
his acknowledged competence as an anesthesiologist and to evidence suggesting that the decision was motivated by personal animosity following his filing of a lawsuit against the hospital and Dr. Peters, the chief of staff. However, case law applying HCQIA has indicated that the subjective state of mind or good faith of the reviewers is not at issue. Instead, the standard to be applied is an objective one. See,Bryan v. James E. Holmes Regional Medical Center (11th Cir. 1994),33 F.3d 1318, 1323, cert. denied, (1995), ___U.S.___, 115 S. Ct. 1363,131 L. Ed.2d 220; Smith v. Ricks (9th Cir. 1994), 31 F.3d 1478, 1485,cert. denied, (1995),___ U.S. ___115 S. Ct. 1400, 131 L. Ed.2d 287; and Austin v. McNamara (9th Cir. 1991), 979 F.2d 728, 734. The rejection of a "good faith" standard is based on legislative history surrounding the adoption of HCQIA, which specifically disapproved subjective analysis of a reviewer's state of mind. 979 F.2d at 734 (rejecting doctor's claims that reviewers were hostile and treated him with contempt as irrelevant to Section 11112 (a) reasonableness standards).
Additionally, the cases have noted that HCQIA imposes an unusual summary judgment standard, by virtue of the presumption contained in the statute. This standard has been explained as follows:
 "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" * * * If not, the court should grant the defendant's motion. In a sense, the presumption language in HCQIA means that the plaintiff bears the burden of proving that the peer review process was not reasonable.
33 F.3d at 1333 (citation omitted) (emphasis in the original). As a result:
 The "inquiry focuses on whether [plaintiff] has provided sufficient evidence to permit a jury to find that he has overcome, by a preponderance of the *Page 6 
evidence, the presumption that physicians in the defendants' position would reasonably have believed that their action was warranted by the facts."
31 F. 3d at 1485 (citation omitted).
Applying the above standards to our case, we find that Dr. Menon has not set forth sufficient evidence from which a jury could conclude that he has overcome the statutory presumption by a preponderance of the evidence. We also conclude, under traditional summary judgment analysis, that Dr. Menon has not shown the specific facts demonstrating that there is a genuine issue for trial. In this regard, the undisputed facts pertinent to this appeal, construed most strongly in Dr. Menon's favor, are as follows. In 1987, while working at the University of Iowa, Dr. Menon met Dr. Esasw Thomas. Thomas asked Menon to join his anesthesia practice and Menon then came to Troy, Ohio, where he obtained staff privileges at Stouder and at Piqua Hospital. These hospitals were both owned by Upper Valley, but were located in separate towns, about fifteen minutes apart. At the time Dr. Menon came to Stouder, very little obstetrical anesthesia was performed at the hospital. This part of the practice grew substantially, but in 1988, Menon left Thomas' practice because a promised partnership had not materialized. After leaving the practice, Dr. Menon did not compete with Thomas, but specialized in obstetrical anesthesia, which had not been a focus of Thomas' practice.
According to Christy Townsend, the Health Information Services manager for Stouder, concerns with Dr. Menon's record keeping began to emerge. In November, 1990, Townsend's staff notified her that incomplete or blank anesthesia records were arriving in the records department. Townsend referred the matter to *Page 7 
Quality Control and the issue was then discussed at a November 13, 1990, Anesthesia Review Committee meeting. Upon being confronted about the problem, Dr. Menon indicated that the blank forms were caused by duplicate sets of anesthesia records being kept, with the completed record being retained in the Obstetrics Department and blanks apparently being sent to medical records. As a result, Townsend took the original blank records, typed random numbers on the bottom, made copies, and returned the originals to the medical records department. Townsend's reasoning was that if duplicate copies were indeed being kept, the completed forms eventually returned would not have the random numbers on the bottom. However, when the completed records were returned to her office by Dr. Menon, the random numbers were on the forms. Subsequently, in December, 1990, Dr. Menon was notified by the Anesthesia Review Committee that anesthesia records must be completely concurrently with delivery.
Since at least 1983, the Health Information Services Department at Stouder has had a policy on correcting medical records, i.e., any corrections or additions to the records must be dated as of the time of the addition or correction. Hospital policy at Stouder has also been that intraoperative reports should be completed intraoperatively. In particular, careful documentation is crucial in anesthesia because it is a high-risk area. During administration of anesthesia, patient monitoring is done in small increments of time and recalling the information later would be difficult. In addition, an improper or incomplete record can reflect on the quality of care, since other medical personnel need to rely on the records. Stouder also requires, per the Anesthesia Administrative Manual, that qualified anesthesia *Page 8 
personnel be present in the room throughout the conduct of all general, regional, and monitored anesthesia care.
In December, 1990, Dr. Menon's staff privileges were renewed, but he was cautioned about his attendance at committee meetings. Problems with attendance at meetings and with documentation persisted in 1991. Attendance and on-call coverage problems were brought to Menon's attention in June and in early October, 1991. Then, on October 29, 1991, the Quality Assurance Department notified the Anesthesia Review Committee of further incomplete or postdated anesthesia records of Dr. Menon. Quality assurance problems are detected at Stouder in various ways, including chart review by two nurses who do utilization and quality monitoring, random chart review in peer committees, and occurrence monitors, which are sheets of paper located in each department. The occurrence monitor process is confidential, and allows anyone to express concerns about management.
Before the recurring documentation issue was addressed by the Anesthesia Review Committee, two incidents occurred in connection with obstetrical cases for which Dr. Menon had administered anesthesia. In one situation, a patient had seizures and in the next, Dr. Menon suspected a seizure, but was mistaken. As a result of these incidents, Menon was summarily suspended on November 1, 1991, by Dr. Peters. A summary suspension is based on a determination that a doctor's conduct requires immediate action to protect the life of a patient or to reduce the substantial likelihood of injury or damage to the health or safety of patients. Shortly thereafter, Dr. Menon filed a lawsuit against the hospital and Dr. Peters, and the *Page 9 
summary suspension was lifted.
In the meantime, Dr. Menon's application for staff privileges came up for review. On January 20, 1992, his privileges were extended pending final review of the two obstetrical incidents. Subsequently, on February 17, 1992, Dr. Menon attended a meeting of the Medical Executive Committee (MEC), which was considering his reappointment. At that time, the MEC expressed concern over Dr. Menon's late medical records. Basically, Dr. Menon's explanation of why he did not timely complete records was as follows. During the preanesthesia stage, patients were frequently in pain and could not answer questions. Further, in the peri-anesthesia stage (during anesthesia administration), sterility had to be maintained and he was concerned about getting the records dirty. Another factor was that Dr. Menon was frequently called to Piqua Hospital from Stouder, making contemporaneous recording a problem. According to Dr. Menon, he made notes on paper towels and bed linens or whatever scraps of paper were around. Later, he went back and filled in the record using these references and information taken down contemporaneously by the nursing staff. The undisputed evidence also was that the sterile field in-anesthesia is only required for approximately fifteen minutes, and after that, an anesthesiologist can contemporaneously record information.
After speaking with Dr. Menon, the MEC approved a six month appointment, but expressed concern about deficient documentation, committee attendance, and Dr. Menon's habit of carrying medication on his person and giving it to patients rather than following procedures for ordering medication through the pharmacy. Following the reappointment, Dr. Menon had continuing and escalating problems *Page 10 
with appropriately documenting records. In April, 1992, the Quality Assurance Department notified Menon and the MEC of further anesthesia records that were found incomplete during routine screening and were later completed with postdated additions.
As part of the evaluation process for Menon's reappointment, the MEC then asked Quality Assurance in June, 1992, to perform a focused review of Menon's records. During this review, 21 records for April and May, 1992, were examined and a number of deficiencies were noted, including missing or illegible information on dosage and timing of medication, and missing vital signs. Although these particular records demonstrated some improvement over past record keeping, the MEC (which was given the results in early July, 1992), did not consider Dr. Menon to be in compliance with requirements. By October, 1992, the MEC had voted to deny privileges to Dr. Menon. However, the committee instead decided in November, 1992, to renew Menon's privileges for six months, to have a focused review by an outside consultant, and to institute corrective action. Thus, the MEC asked Menon to meet with the committee in December, 1992, to discuss a number of records that had been identified by the Anesthesia Review Committee from April through November as having deficient or postdated documentation. Dr. Menon did not meet with the MEC as requested, and on December 22, 1992, the MEC imposed a twenty-nine day suspension as a corrective action for Menon's continued failure to timely complete records, for postdating of records, and for poor attendance at committee meetings.
Dr. Menon asked for a fair hearing on the corrective action, and a hearing *Page 11 
was held in May, 1993 The result of the appeal was that the suspension was not imposed until November, 1993, when the MEC decision was ultimately affirmed by the Stouder Board of Trustees. In the meantime, consultants from the American Society of Anesthesiologists, a national professional organization for anesthesiologists, came to Stouder on January 13-15, 1993, to evaluate the Anesthesia Department, including Dr. Menon. Dr. Menon indicated in his testimony that he spoke with the consultants and learned then for the first time that he should not postdate anesthesia records. Dr. Menon's explanation of why he postdated records was that he wanted to maintain continuity. His testimony also was that after becoming aware that this practice was unacceptable, he tried his best not to postdate records. However, after the consultants came to Stouder, Dr. Menon was again contacted by the Anesthesia Review Committee and was asked to explain missing documentation in records for procedures on January 30, 1993, and April 23, 1993. Eventually, the committee assessed points against Dr. Menon for the missing documentation. Further instances of postdating records occurred in October, 1993, in two obstetrical cases. In these cases, Dr. Menon entered documentation for the records as if he were present, when, in fact, he was documented as being at Piqua Hospital when the recorded events took place.
In May, 1993, the MEC received the consultants' report. The report, which was based on interviews with thirty Stouder staff members, confirmed the MEC concerns about Dr. Menon's practice, but did not disclose new information. In particular, the report noted quality of care concerns based on post hoc changes of records to deflect criticism and poor record keeping by Menon (based on random *Page 12 
sampling of records by the consultants). Additionally, in May, the hearing officer issued his report on Dr. Menon's appeal of the twenty-nine day suspension. In the report, the officer found that there was no definitive violation of attendance requirements based on ambiguity in the bylaws and the lack of formality in applying the attendance requirements. However, the officer also found that the request for corrective action, insofar as it was based on medical records entry deficiencies, was supported by "uncontroverted, substantial credible evidence." As was noted above, in November, 1993, the Board of Trustees ultimately upheld the suspension, and Dr. Menon did not appeal that decision.
Although the record keeping problems were the overwhelming basis for the ultimate denial of Dr. Menon's privileges, other problems were cited by the MEC in its decision. For example, the MEC noted a long-standing problem with Dr. Menon's continuing practice of leaving patients during a procedure because he was on call at a different hospital. In this regard, the evidence indicates that Dr. Menon was undisputably very busy and tried to be available when he could. Given the nature of obstetrical work, and the fact that Piqua and Stouder were at least fifteen minutes apart, there were times when Dr. Menon needed to be in two places at once. However, this was not the Hospital's fault; instead Dr. Menon is the one who chose to have staff privileges at more than one hospital. As was noted above, as early as October, 1991, coverage problems were brought to Dr. Menon's attention. Dr. Menon also admitted coverage problems existed during 1990 and 1991, because he was on call for Navy Duty during the Gulf crisis. At times, he was at Wright Patterson Air Force Base on a daily basis and when he was out of *Page 13 
town, the hospital had no one to do coverage. According to Dr. Menon, he mentioned the coverage problem to the MEC, and was told that he needed to find someone to help him. However, Dr. Menon did not do so.
After the October, 1991 letter to Dr. Menon about coverage, problems still persisted. For example, on December 31, 1991, the Surgical Review Committee notified the Anesthesia Review Committee that Dr. Menon was on emergency call at Stouder in November, 1991, but could not come to Stouder for an emergency surgery for two hours because he was involved with an obstetrical patient at Piqua. In September or October, 1992, an on call schedule was established for obstetrical anesthesia coverage, and in November, 1992, Stouder established a policy for the Anesthesia Department that anesthesiologists were to remain in house after the insertion of epidural analgesia until delivery. Following adoption of this policy, Dr. Menon was notified by the MEC on January 22, 1993, of a lack of coverage in the hospital in December, 1992, and of Dr. Menon's failure to let the hospital know in a timely fashion that he would not be available for on call coverage.
The 1993 report from the American Anesthesia Consultants also noted that concerns had been expressed by staff about Dr. Menon overextending himself and starting an epidural for analgesia only to be called away on another case. Dr. Menon was again notified by the MEC in July, 1993, about reports that he had been unavailable without having appropriate coverage. Finally, in October, 1993, two cases occurred in which Dr. Menon started epidurals on patients at Stouder and left before delivery. However, while the records recorded vital signs as if Dr. Menon were at Stouder, he was documented as having been in Piqua at the same *Page 14 
time. In response to the coverage problem, Dr. Menon testified that he did his best to be available, but said that sometimes he was called to Piqua Hospital and had to leave. His attitude was that obstetricians had knowledge about anesthesia and if he needed to come back to Stouder, he could return from Piqua within fifteen minutes. With regard to the policy that was adopted to require anesthesiologists to stay with patients until delivery, Dr. Menon acknowledged that he knew this would be a problem if he were on call at both hospitals. Dr. Menon also did not deny violating hospital policy by leaving patients with epidural analgesia in October, 1993. His position was that the patients had been given low doses of medication and that he had told the obstetrician in charge that he was on call and might have to leave.
The third problem area mentioned by the MEC in its decision denying privileges was that Dr. Menon had a longstanding and persistent failure to take an active and cooperative role in quality assurance activities. Again, the record reveals a number of instances where Dr. Menon either did not appear for meetings as requested or failed to furnish information when asked to do so. For example, although asked by the MEC to attend a meeting in December, 1992, to discuss MEC concerns, Dr. Menon did not appear. At other times, Dr. Menon was asked to furnish information to the Anesthesia Review Committee about records that had been identified during random peer review. However, he failed to respond until after the committee had already considered the matter and assessed penalties for record keeping. The upshot was that additional time was spent reconsidering matters already reviewed. Moreover, although Dr. Menon's attendance record at *Page 15 
committee meetings was not a basis of the MEC decision, the facts indicate that while Menon's actual attendance record satisfied minimum requirements, he frequently stayed only five to ten minutes at meetings and was not present for the part of the meetings devoted to peer review for quality assurance. Again, Dr. Menon did not dispute these facts. His testimony was that he did start attending more meetings after being notified of the MEC concern. However, the problem was that when he went to meetings, he would have to leave because he was paged for emergencies.
Based on the above record, we cannot find that Dr. Menon has furnished sufficient evidence from which a jury could conclude that he has overcome, by a preponderance of the evidence, the presumption that physicians in the defendants' position would reasonably have believed the denial of staff privileges was warranted by the facts. Although Dr. Menon presented evidence that he is a competent anesthesiologist, even considered excellent by a number of doctors, his privileges were not denied on the basis of medical incompetence. Further, while Dr. Menon provided evidence that he was concerned with patient welfare first and record keeping second, a lack of concern for patients was also not a predicate for denial of his privileges. Instead, the MEC's decision was premised primarily on continued incomplete, untimely, and postdated record keeping, as well as on continued problems with coverage and failure to take an active and cooperative role in quality assurance. Although Dr. Menon's deficiencies in these areas were caused to some extent by his busy schedule, we can only conclude that the choice to overextend himself, and, therefore, the responsibility for the consequences, *Page 16 
belonged to Dr. Menon.
Dr. Menon did present evidence of a memo sent to all Stouder physicians in September, 1993, explaining that records must not be postdated. The testimony on this subject, construed in a light most favorable to Dr. Menon, was that postdating entries was an issue that had arisen many times over the years with the medical staff, but was not a significant problem. The memo itself stressed that the errors were not intentional but were caused by lack of awareness of proper procedures. Dr. Menon's own defense to charges of postdating was that he was unaware that this was unacceptable. However, since Dr. Menon had learned at the latest, in January, 1993, of the impropriety of postdating, his own postdating after that time could not have been inadvertent. The evidence also revealed that no physician was in a similar position to Dr. Menon, in terms of untimely as well as postdated and incomplete records, coverage problems, and lack of participation in quality assurance activities. Therefore, we find no basis for concluding that the physicians on the MEC were unreasonable in denying Dr. Menon's staff privileges. As a result, we find the defendants are immune from money damages under HCQIA. In this case, the parties did not begin as equals in the litigation, based on the rebuttable presumption set forth in the Section 11112(a), Title 42, United States Code. However, even if this were otherwise and the rebuttable presumption were not in the statute, we would reach the same conclusion based on the following summary judgment standard outlined in Dresher v. Burt(1996), 75 Ohio St. 3d 280,662 N.E.2d 264:
 [A[ party seeking summary judgment, on the ground that the nonmoving *Page 17 
party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. * * * [I]f the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.
75 Ohio St.3d at 293, 662 N.E.2d at 274. Again, based on the record, we find no material issues of fact. In accordance with typical summary judgment procedure, the defendants submitted evidence not only that their actions fell within the immunity requirements outlined in HCQIA, but also that the peer review process was reasonable under all the criteria outlined in Section 11112, Title 42, United States Code. Dr. Menon then had the burden to set forth specific facts showing that there was a genuine issue for trial. As we have noted, Dr. Menon did not meet the burden of showing genuine issues of fact concerning whether the defendants acted in the reasonable belief that Dr. Menon's privileges should be denied, based on the known facts, and after a reasonable effort to obtain the facts, including the provision of adequate notice and hearing to Dr. Menon. Section 11112(a), Title 42, United States Code. As we noted above, the evaluation process took place over a period of almost three years, during which time Dr. Menon continued in a course of conduct that was objectionable to the hospital. Accordingly, even applying traditional summary judgment analysis, we would still conclude the hospital is entitled to immunity.
Dr. Menon's second argument In connection with this assignment of error is that even if immunity under HCQIA applies, the immunity only covers liability for *Page 18 
money damages, making injunctive and declaratory relief still appropriate. Thus, because Dr. Menon requested reinstatement in his complaint, he claims his suit should survive. Upon consideration, we find this assertion without merit.
A similar contention was made in Imperial v. Suburban Hosp. A'ssn.,Inc. (4th Cir. 1994), 37 F. 3d 1026, 1031. In that case, the court concluded that while HCQIA provided immunity for money damages, it did not preclude injunctive or declaratory relief. However, the court also found that although the plaintiff had asked in the complaint to have his privileges restored, he had failed to preserve on appeal an initial claim for injunctive relief by not moving for an injunction or placing his continuing interest in injunctive relief at issue. Id. Likewise, in the present case, Dr. Menon did not move for an injunction, and although he did mention in his reply to summary judgment that he was seeking reinstatement, he provided no specific reason why the court could, or should separate that matter from the summary judgment issue. Thus, we conclude, as the court did in Imperial, that the issue of injunctive relief was abandoned. However, even assuming for purposes of argument that the reinstatement claim was not abandoned, we find no reason to alter our decision. Although cases may conceptually exist in which a request for injunctive relief can be separated from money liability, the issue of reinstatement in the present case is intertwined with the request for money damages, i.e., Dr. Menon would be required to prove that the peer review process was unreasonable in order to prevail on either claim. Since we have already concluded that no issues of fact have been raised in that regard, we cannot fathom how Dr. Menon could sustain an action for injunctive relief. Accordingly, even if the request for *Page 19 
reinstatement had been preserved, summary judgment would still be warranted.
Based on Dr. Menon's failure to raise issues of material fact concerning the reasonableness of the peer review process, we find that Stouder and Upper Valley are immune from damages under HCQIA. Additionally, for the same reasons, we find Dr. Menon's claim for reinstatement without merit. Therefore, the second assignment of error is overruled.
 II
As was noted in the discussion of the above assignment of error, Dr. Menon has not specifically contested the procedural adequacy of the hearing process, except in relation to the admission of the consultant's report from the American Society of Anesthesiologists. In this context, Dr. Menon contends in his fourth assignment of error that the report was hearsay and that its admission improperly denied him the ability to cross-examine in violation of the requirements of Stouder's Fair Hearing Plan. If Dr. Menon's position is correct, the hearing process could also be inadequate for purposes of immunity under HCQIA, as Section 11112(a)(3), Title 42, United States Code, requires that the professional review action in question be taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." Section 11112(b) goes on to detail certain requirements for adequate hearings, including the right to call and cross-examine witnesses. However, that section also states in (b)(C)(3)(iv) that a physician has the right in the hearing "to present evidence, determined to be relevant to the hearing officer, regardless of its admissibility in a court of law." *Page 20 
Dr. Menon availed himself of this opportunity by presenting witnesses and
eliciting testimony that normally would not have been admissible in a court of law. For example, Dr. Dagani, an OB-GYN doctor at Stouder, testified on Dr. Menon's behalf about rumors that Dr. Peters, Chief of Staff in 1991 and 1992, wanted to get Dr. Menon off the staff. This statement was clearly offered to prove the truth of the matters in the statement. However, Dr. Dagani was unable to identify any persons who had told him the rumors. By the same token, Stouder offered the report from the American Society of Anesthesiologists, which recounted both positive and negative comments about Dr Menon by the Stouder staff. Again, these statements were offered for their truth and only a few of the individuals who talked to the consultants were called as witnesses.
In view of the fact that Section 11112 allows physicians to present relevant testimony, even if inadmissible, HCQIA has been interpreted as permitting hearsay testimony from both sides. See, Imperial v. SuburbanHospital A'ssn., inc. (D. Md. 1993), 862 F. Supp. 1390, 1397,aff'd (4th Cir. 1994), 37 F. 3d 1025 (holding hearing did not violate due process under HCQIA even though hearsay testimony was admitted, because HCQIA does not prohibit the use of hearsay in peer review process). We note that the plain statutory language of 11112(b)(C)(3)(iv) discusses only the right of the physician to introduce inadmissible evidence and is silent on the question of whether the opposing side may also have the right to introduce inadmissible evidence. However, that fact does not mean that the admission of hearsay testimony was either violative of due process or prevented Dr. Menon from having a fair hearing for purposes of the immunity afforded under *Page 21 
HCQIA. We reach this conclusion on two separate grounds: first, HCQIA provides for immunity even if all of the enumerated conditions in Section 11112(b) are not met; and second, the admission of hearsay in an administrative type of setting does not violate due process.
In this context, Section 11112(b) states as follows:
 A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.
Consequently, "`[i]f other procedures are followed but are not precisely of the character spelled out in [section 11112 (b)], the test of adequacy may still be met under other prevailing law.'" Bryan v. JamesE. Holmes Regional Medical Center 33 F.3d at 1336 (quoting H.R. Rep. No. 903). See also, Smith v. Ricks, 31 F.3d at 1485, n. 5.
In the present case, the hearing procedures were adequate under other prevailing law. Specifically, as a general rule, the use of hearsay is permitted in administrative type hearings, but the "discretion to consider hearsay evidence cannot be exercised in an arbitrary manner." Haley v. Ohio State Dental Bd. (1982), 7 Ohio App.3d 1, 6,453 N.E.2d 1262, 1268. Applying this standard, and reviewing the record, we find no evidence that the hearing officer acted arbitrarily or abused his discretion in admitting the consultants' report. In the first place, the Stouder Fair Hearing Plan allows the hearing officer to consider this kind of evidence, by stating as follows:
Each party shall have the following rights: * * *
 (d) to present evidence determined to be relevant by the presiding officer, *Page 22 
regardless of its admissibility in a court of law.
 * * *
 The hearing need not be conducted according to rules of law relating to the examination of witnesses or presentation of evidence. In the discretion of the hearing officer, any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs may be considered regardless of the admissibility of such evidence in a court of law.
Dr. Menon's position is that the report was inadmissible under these standards, and therefore violative of due process, because hearsay is not the type of evidence upon which responsible persons customarily rely in the conduct of serious affairs. However, in the peer review process, the consultants' report is exactly the type of evidence appropriately relied upon by reviewers. For example, in Mathews v. Lancaster GeneralHosp. (3d Cir. 1996), 87 F.3d 624, 638, the hospital had, during a physician's peer review process, obtained a review by an outside consultant, who concluded that the physician had provided substandard care. Although the physician ultimately, in litigation, presented testimony from his own expert negating the finding of substandard care, the court held that this evidence did not rebut the statutory presumption as to the reasonableness of the board's decision. In particular, the court focused on the facts known to the board at the time of its decision, including the outside consultant's report. Moreover, the court also commented that referring the issue of the doctor's care to an outside consultant negated the doctor's claims of a conspiracy. 87 F.3d at 640.
Likewise, in the present case, we find nothing improper about the MEC's request for an outside review, its reliance on the review, or the admission of the report at the hearing. The undisputed testimony on this subject was that the MEC originally voted to deny Dr. Menon's privileges in October, 1992, but altered that *Page 23 
decision at its next meeting to allow for review by an outside consultant. According to the uncontested testimony of Dr. Peters, the purpose of the outside review was to make sure the MEC was being fair to Dr. Menon. The consultants then spent three days at the hospital, talking to thirty individuals, including Dr. Menon and three of the five witnesses Dr. Menon eventually called to testify on his behalf at the hearing. The consultants also randomly reviewed records.
Further, the reviewers did not focus simply on Dr. Menon, but evaluated the entire Anesthesia Department, its procedures, and personnel. The report that came back did not reveal new information about Dr. Menon, but merely confirmed what the MEC already knew. In our opinion, this fact alone would render harmless the admission of the report.
We note that the consultants were actually more harsh than the MEC in their assessment of Dr. Menon, even recommending that Dr. Menon be investigated for widespread fraud in record keeping and possibly reported to public authorities. However, the MEC did not take this course, but simply voted to deny Dr. Menon privileges. In view of these facts, we find no abuse of discretion on the hearing officer's part in admitting the report.
As a further matter, we observe that Dr. Menon claims prejudice because the consultants' report contained statements of unidentified persons, thereby depriving him of the right to have knowledge of persons adversely testifying against him. However, the hearing transcript indicates that the report was identified as an exhibit before the hearing, and pages 3-4 of the report list the names of all persons interviewed by the consultants. Consequently, had Dr. Menon chosen, he could *Page 24 
have called these individuals to testify at the hearing and could have cross-examined them about the comments in the report. Therefore, Dr. Menon could not have been prejudiced since he was aware of all adverse witnesses and had the ability to call them to testify. By contrast, Stouder actually had less information with regard to Dr. Menon's hearsay evidence, as the names of the relevant parties were not made available.
Based on this record, we find nothing improper about the admission of the consultant's report and no procedural inadequacy in the hearing process. Accordingly, having found nothing to disturb our prior conclusion about the defendants' immunity, the fourth assignment of error is overruled.
 III
In the second assignment of error, Dr. Menon contends that summary judgment was improper because genuine issues of material fact exist concerning whether the defendants' denial of privileges was arbitrary, capricious or discriminatory. This assignment of error is premised on state law principles, as set forth as follows in Bouquett v. St.Elizabeth Corp. (1989), 43 Ohio St.3d 50, 538 N.E.2d 113:
 The board of trustees of a private hospital has broad discretion in determining who shall be permitted to have staff privileges. Courts should not interfere with the exercise of this discretion unless the hospital has acted in an arbitrary, capricious or unreasonable manner or, in other words, has abused its discretion
Id., approving and following Khan v. Suburban Community Hospital (1976),45 Ohio St.2d 39, 340 N.E.2d 398.
As an initial matter, we note that state law is inapplicable, since HCQIA *Page 25 
indicates that a professional review action meeting its standards triggers immunity for "damages under any law of the United States or of any State," except civil rights laws. Section 11111(a)(1), Title 42, United States Code. However, assuming for purposes of argument that state law applies, and applying the traditional summary judgment analysis in Civ. R. 56, we find that no material issues of fact have been raised in connection with Stouder's decision to deny privileges to Dr. Menon. Again, although Dr. Menon presented evidence that he was a medically competent anesthesiologist and was concerned with patient welfare, these matters were not relevant to the denial of his privileges. Given the ongoing investigation that took place over several years, the repeated warnings to Dr. Menon, the outside review by independent consultants supporting the MEC's findings, the MEC decision to forego a recommended fraud investigation, and our limited review of the hospital's decision, we cannot find specific facts showing a genuine issue for trial. As a result, we overrule the second assignment of error, first as moot given the controlling effect of the federal law, and second, as without merit based on application of state law and the absence of genuine issues of material fact.
 IV
Finally, in the third assignment of error, Dr. Menon contends that summary judgment on his constitutional claims was improperly granted because the trial court did not allow him the opportunity to conduct further discovery. In this context, the law is established that trial courts may delay decisions on summary judgment to allow a nonmoving party to conduct discovery. However, if an appellant does not seek relief under Civ. R. 56(F), he has failed to preserve the right for appeal. See, *Page 26 e.g., Stegawski v. Cleveland Anesthesia Group, Inc. (1987),37 Ohio App.3d 78, 523 N.E.2d 902, 903. This is consistent with the general rule that appellate courts will not consider error that could have been brought to the trial court's attention and avoided. See, e.g.,Schade v. Carnagie Body Co., (1982) 70 Ohio St. 2d 207, 210,436 N.E.2d 1001, 1003.
In the present case, Dr. Menon argued in his November, 16, 1995 summary judgment reply memorandum that Stouder, although a private institution, may have had sufficient connection with the state and federal governments to be considered a "state actor" for substantive due process purposes. Dr. Menon also commented that further discovery must be done to resolve this issue. However, even though the trial court's summary judgment decision was not issued until April 10, 1996, Dr. Menon never asked for a continuance, nor did he comply with the requirements of Civ. R. 56 (F) for obtaining relief. As a result, this issue has not been preserved for our review, and we decline to consider the third assignment of error.
Based on the preceding analysis, we find that defendants are entitled to immunity from damages under either federal interpretation of HCQIA or traditional summary judgment standards. Moreover, while state law claims are not applicable in light of HCQIA, even if state law were considered, genuine issues of material fact have not been raised concerning the hospital's decision to deny staff privileges. Accordingly, the decision of the trial court awarding summary judgment to the defendants is AFFIRMED. *Page 27