**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

June 15, 2015

# In the Court of Appeals of Georgia

A15A0559. WILLIAMS v. THE COLUMBUS CLINIC, P.C.

ANDREWS, Presiding Judge.

After the Columbus Clinic, P.C. (the "Clinic") terminated Reginald A. Williams' employment as a physician, Williams filed a complaint in the trial court asserting claims for breach of contract. The parties filed cross-motions for partial summary judgment as to the Clinic's liability on Count 1 of the complaint, which alleged that the Clinic violated the termination provisions of Williams' employment agreement, and the trial court granted the Clinic's motion and denied Williams' motion. Williams appeals, arguing that the trial court erred in concluding that the Clinic was authorized to terminate his employment for cause when a hospital "restricted" his privileges by imposing a proctorship on him. As set forth below, we

conclude that a genuine issue of material fact remains as to whether the proctorship was a restriction of privileges, and we therefore reverse.

> On appeal from the grant of summary judgment this Court conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citation and punctuation omitted.) *Del Lago Ventures v. QuikTrip Corp.*, 330 Ga. App. 138, 139 (764 SE2d 595) (2014).

So viewed, the record shows that Williams and the Clinic entered into a Physician Employment Agreement (the "Agreement") on December 31, 2008 under which Williams was to "provide professional medical and surgical services on behalf of [the Clinic] as an exclusive employee of [the Clinic]" and receive a salary as set forth in Exhibit A to the Agreement. The term of the Agreement was for one year from its "Commencement Date" of January 15, 2009, and the Agreement provided that "[u]nless terminated as provided herein, this Agreement shall automatically renew for successive terms of one (1) year each upon the anniversary date of the Commencement Date." Section 7.1 of the Agreement sets forth the circumstances in

which the Clinic was entitled to terminate the Agreement for cause and provides in relevant part:

> [The Clinic] shall . . . have the right to terminate this Agreement immediately, with cause, upon written notice to Physician if: . . . (ii) Physician's privileges or staff membership at any hospital are terminated, revoked, suspended (other than for infrequent occurrences due to the failure to complete medical records in a timely manner), restricted, or terminated in any way (except for voluntary termination of privileges undertaken at the request and with the consent of [the Clinic]).

One of the Columbus hospitals where Williams had privileges was Doctors Hospital (the "Hospital"). Williams was granted Medical Staff membership on the Affiliate Staff at the Hospital in January 2009 and was granted Medical Staff membership on the Active Staff in January 2010 with privileges to render certain delineated professional services as approved by the Hospital's Board of Directors. On or about May 19, 2010, Williams was advised that the Medical Executive Committee ("MEC") of the Medical Staff of the Hospital was imposing a three-month proctorship on him. On or about June 18, 2010, the Clinic notified Williams that it was terminating his employment for cause under Section 7.1 (ii) of the Agreement, effective June 25, 2010. The Clinic's partners and board of directors believed that the

3

Clinic was authorized to terminate the Agreement for cause because the mandatory proctorship imposed by the Hospital constituted a restriction of Williams' privileges.

Article One of the Hospital's Medical Staff Bylaws, which includes definitions, states: "Clinical Proctoring is an objective evaluation of a Practitioner's actual clinical competence by a monitor or proctor who represents the Medical Staff and is responsible to the Medical Staff." Article Three of those bylaws subsequently states:

> In most instances, proctors act as monitors to evaluate the technical and cognitive skills of another Practitioner and do not directly participate in patient care, have no physician/patient relationship with the patient being treated, do not receive a fee from the patient, represent the Medical Staff, and are responsible to the Medical Staff.

The record reflects that on or about June 15, 2010, Williams' counsel sent a letter to the Hospital's General Counsel and Senior Executive Officer stating as follows:

> As you are aware, Dr. Williams has cooperatively been operating with a proctor for nearly a month now, despite the fact that the MEC has not, until now, actually formulated a concrete set of requirements for the proposal. Dr. Williams is prepared and willing to continue his cooperation with a reasonable proctorship program . . . The proposal from the MEC, however, is not acceptable in several particulars.

Williams's counsel stated that, among other issues, the proposal was unclear and contradictory as to whether Williams must have the approval of the proctor before performing elective surgical procedures. Williams' counsel stated that Williams would not agree to such a requirement, explaining: "Such a restriction adversely affects Dr. Williams' clinical privileges in a very concrete way and, therefore, constitutes an adverse action that would entitle Dr. Williams to a fair hearing" under the Medical Staff Bylaws. Williams' counsel's letter stated that it was including a revised proctorship proposal. The Hospital's outside counsel responded by letter dated June 18, 2010, stating:

> The role of the proctor is not to substitute his/her judgment for that of Dr. Williams, but to assist, advise as requested, observe and report. The proctor need not concur in the selection of the surgical procedure, but the proctor's concerns or disagreement should be noted and evaluated. As such, the proctoring requirements are not reportable to the National Practitioner Data Bank and do not constitute an adverse action that gives rise to the right to request a hearing. The clarified criteria are enclosed with this letter.

The Medical Staff Bylaws define an "adverse action" as "[a]n action that adversely affects an individual's Medical Staff membership or clinical privileges." Article Seven of the Medical Staff Bylaws provides that "[o]nly individuals who are

5

subject to an adverse recommendation or action are entitled to a hearing under these Bylaws" and lists recommendations or actions that are deemed adverse; a proctorship is not among them. The list, however, identifies as an adverse action the "[i]nvoluntary imposition of significant consultation requirements where the supervising Practitioner has the power to supervise, direct, or transfer care from the Practitioner under review." The Hospital did not report the proctorship to the National Practitioner Data Bank ("NPDB") or any Georgia licensing board. Under Article Six of the Medical Staff Bylaws, the Hospital's Chief of Staff, a Department Chairperson, or the Chief Executive Officer may impose a summary suspension or restriction of the clinical privileges of a physician in certain urgent circumstances, including where "the conduct of an individual with clinical privileges appears to require that immediate action be taken to protect the life or well-being of a patient(s)." Williams was not subject to a summary suspension or restriction of privileges under Article Six on or before June 25, 2010.

In granting partial summary judgment in the Clinic's favor, the trial court summarily concluded that Section 7.1 (ii) of the Agreement was clear, concise, controlling, and unambiguous and that the Clinic was authorized to terminate the Agreement when the Clinic imposed a proctorship on Williams. Williams argues that

6

the trial court erred, as the proctorship did not give the Clinic cause to terminate the Agreement.

1. *Construction of Section 7.1 (ii)*. "Construing the terms of an express contract is generally a question of law for the court, unless an ambiguity is presented which cannot be resolved by the ordinary rules of construction." *4 G Properties v. GALS Real Estate*, 289 Ga. App. 315, 316 (656 SE2d 922) (2008). The cardinal rule of contract construction is to ascertain the intent of the parties at the time they entered the agreement. *Gonzalez v. Crocket*, 287 Ga. 430, 433 (696 SE2d 623) (2010). While contractual terms generally carry their ordinary meanings, *Lafarge Bldg. Materials v. Thompson*, 295 Ga. 637, 640 (763 SE2d 444) (2014), "technical words, or words of art, or used in a particular trade or business, will be construed, generally, to be used in reference to this peculiar meaning." (Citation and punctuation omitted.) *Pace Constr. Corp. v. Houdaille-Duval-Wright Div., Houdaille Indus.,* 247 Ga. 367 (276 SE2d 568) (1981); see also OCGA § 13-2-2 (2). We must always consider the context in which a contractual term appears in determining its meaning. *Archer Western Contractors v. Estate of Pitts*, 292 Ga. 219, 224 (2) (735 SE2d 772) (2012).

With these principles in mind, we turn to the language in Section 7.1 (ii) of the Agreement authorizing the Clinic to terminate the Agreement for cause if Williams'

7

"privileges . . . at any hospital are . . .restricted." The Clinic maintains that we need look no further than the dictionary definition of "restrict" to determine the meaning of "restricted" in Section 7.1 (ii). Those definitions include "to confine or keep within limits, as of space, action, choice, or quantity." http://www.thefreedictionary.com/restrict (citing Random House Kernerman Webster's College Dictionary (2010)), or, similarly, "to confine or keep within certain often specified limits or selected bounds." Id. (citing Collins English Dictionary (2003)). We conclude, however, that it is readily apparent from the context in which "restricted" appears in this Agreement that we must look beyond a dictionary to determine the intended meaning of the term.

The term "restricted" is used in Section 7.1 (ii) in relation to hospital "privileges." The privileges accorded to a physician to treat patients at a hospital are by their very nature always "restricted" within the ordinary or dictionary definition of the term. According to one medical dictionary, "privileges" refers to "authority granted to a physician or dentist by a hospital governing board to provide patient care in the hospital." http://medical-dictionary.thefreedictionary.com/privileges (citing Mosby's Medical Dictionary (8th ed. 2009)). The same definition states: "Clinical privileges are limited by the individual's professional license, experience, and

8

competence." Id. The Hospital's Medical Staff Bylaws define "privileges," in relevant part, as: "Authorization granted by the Board to an individual to provide specific patient care services in the Hospital within defined limits, based on the individual's license, education, training, experience, competence, health status, judgment and individual character," and further explain that clinical privileges granted to physicians "shall be delineated on an individual basis." Thus, privileges granted to physicians are always restricted in the sense that they will not extend beyond the physician's area of expertise. Further, a physician's privileges are always restricted in that they are conditioned on or subject to the specific requirements of a hospital's medical staff bylaws and rules and regulations. See *Stein v. Tri-City Hosp. Auth.*, 192 Ga. App. 289 (384 SE2d 430) (1989) (physician's hospital privileges permissibly terminated when he failed to comply with bylaw relating to liability insurance). The Hospital's Medical Staff Bylaws, for example, require every applicant for privileges to agree to various requirements, including to "[a]bide by these Bylaws, the Rules and Regulations, and all other rules, policies and procedures, guidelines, and other requirements of the Medical Staff and the Hospital." Given that every physician's privileges are necessarily "restricted," interpreting "restricted" in its ordinary sense here would

9

mean that the Clinic essentially enjoyed an unfettered right of termination, a result contrary to the parties' clear intent to create a non-at-will employment relationship.

We agree with Williams that a "restriction" of privileges at a hospital is a word or term of art that should be interpreted in accordance with its "peculiar meaning" in this context. See *Vineville Capital Group v. McCook*, 329 Ga. App. 790, 795 (766 SE2d 156) (2014). The term "restricting" appears in the Health Care Quality Improvement Act ("HCQIA"), 42 USC §§ 11101-11152. Under the HCQIA, a hospital that "takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days; . . . shall report [the action] to the [State] Board of Medical Examiners," 42 USC § 11133 (a) (1) (A), and under the HCQIA's implementing regulations also must report the action to the NPDB. 45 CFR § 60.12 (a) (1). A "professional review action" is defined in pertinent part as "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician . . . and which affects (or may affect) adversely the clinical privileges . . . of the physician." 42 USC § 11151 (9). "The term 'adversely affecting' includes reducing, *restricting*, suspending, revoking, denying,

or failing to renew clinical privileges or membership in a health care entity."

(Emphasis supplied.) 42 USC § 11151 (1); see also 45 CFR § 60.3.

Although neither the HCQIA or the regulations thereunder provide a definition of "restrict," the 2001 National Practitioner Data Bank Guidebook ("2001 NPDB Guidebook"), portions of which are included in the record, contains pertinent guidance. The guidebook provides examples of actions that are reportable and non-reportable, and states that it would not be reportable if "based on assessment of professional competence, a proctor is assigned to supervise a physician . . . but the proctor does not grant approval before medical care is provided by the practitioner." 2001 NPDB Guidebook at E-21.[1] Also instructive are cases addressing when a

---

[1] The Health Resources and Services Administration of the U.S. Department of Health and Human Services published a revised NPDB Guidebook this year (the "2015 NPDB Guidebook"), with additional guidance on the meaning of "restriction" and the circumstances under which a proctorship constitutes a restriction. It states that "[w]hen used by the NPDB in the context of clinical privileges actions, a 'restriction' is the result of a professional review action based on clinical competence or professional conduct that leads to the inability of a practitioner to exercise his or her own independent judgment in a professional setting." 2015 NPDB Guidebook at E-32. The guidebook further explains that "[i]f, for a period lasting more than 30 days, the physician . . . cannot perform certain procedures without proctor approval or without the proctor being present and watching the physician, . . . the action constitutes a restriction of clinical privileges." Id. at E-37. We recognize, however, that these specific statements are not germane to determining the intent of the parties when they entered the Agreement in December 2008. See *Gonzalez*, supra, 287 Ga. at 433.

hospital's action rises to the level of a professional review action that does or may adversely affect a physician's privileges for purposes of the HCQIA. In *Mathews v. Lancaster Gen. Hosp.*, the Third Circuit concluded that a letter recommending focused outside review of certain cases that had been identified by a hospital committee as involving substandard care was not a "professional review action." 87 F3d 624, 634 (3d Cir. 1996). The Third Circuit stated generally that a "decision or recommendation to monitor the standard of care provided by a physician or factfinding to ascertain whether a physician has provided adequate care" were professional review activities,[2] i.e., preliminary investigative measures taken in a reasonable effort to obtain facts relevant to a possible change in privileges, not professional review actions. Id. Courts, citing *Mathews*, have concluded that auditing a physician is not a professional review action, *Singh v. Blue Cross and Blue Shield of Massachusetts*, 182 FSupp2d 164, 171 (D. Mass.2001), nor is a recommendation that a physician submit to an outside professional evaluation. *Morgan v. PeaceHealth*,

___

[2] The term "professional review activity" is defined by the HCQIA as "an activity of a health care entity with respect to an individual physician - (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity, (B) to determine the scope or conditions of such privileges or membership, or (C) to change or modify such privileges or membership." 42 USC § 11151 (10).

14 P3d 773, 782 (Wash. App. 2000); see also *Wood v. Archbold Med. Center*, 738 FSupp2d 1298, 1363 (M.D. Ga. 2010) (recommendation that physician undergo outside psychiatric evaluation not professional review action). If the actions or recommendations discussed in *Mathews, Morgan*, and *Wood* did not constitute reportable professional review actions, they necessarily did not adversely affect or restrict physician privileges. By contrast, in *Azmat v. Shalala*, the court held that a letter recommending that a surgeon obtain a second opinion on all procedures that were not immediately life-threatening and acquire assistance from a second physician on all major cases were recommended restrictions on his privileges reportable under the HCQIA. 186 FSupp2d 744, 750 (W.D. Ky. 2001); see also *Fobbs v. Holy Cross Health System Corp.*, 789 FSupp 1054, 1064 (E.D. Cal. 1992), aff'd 29 F3d 1439 (9th Cir. 1994) (monitoring constraints under which physician was required to have second opinion on every admission and monitor was to be present during operations and to participate in follow-up care constituted professional review action). Considering these authorities, we conclude that at the time of contracting the parties would not have understood a hospital's decision to appoint a proctor to monitor or evaluate a physician or his or her standard of care as a restriction of privileges unless

13

the hospital imposed conditions or limitations that would impact the physician's independence or autonomy in providing care to patients.

2. *Whether the proctorship is a restriction.* Turning to the issue of whether the proctorship imposed upon Williams constituted a restriction on his privileges under the construction of the Agreement set forth in Division 1, we conclude that an issue of material fact remains.

Determining whether the proctorship was a restriction on Williams' privileges requires examination of the specific terms and conditions of the proctorship. As set forth above, the Hospital's Medical Staff Bylaws provide that "*[i]n most instances*, proctors act as monitors to evaluate the technical and cognitive skills of another Practitioner and do not directly participate in patient care, have no physician/patient relationship with the patient being treated, do not receive a fee from the patient, represent the Medical Staff, and are responsible to the Medical Staff." (Emphasis supplied.) While this provision may suggest that a proctor's role typically is solely evaluative, it also leaves open the possibility that a proctor could assume different or additional responsibilities. The record in this case contains scant evidence on the terms of the proctorship under which Williams operated. The record establishes that Williams learned of the proctorship in mid-May 2010, but it is silent as to what

14

proctorship terms the Hospital communicated to Williams at that time or what information Williams or the Hospital conveyed to the Clinic about the proctorship. The record also shows that although Williams began operating under a proctorship in May, the Hospital and Williams were communicating in June 2010 about the definitive terms of the proctorship. The draft proctorship proposals exchanged by the parties are not in the record, and the record does not contain evidence as to the final proctorship terms, if any, to which the parties agreed. The Hospital's outside counsel's June 18, 2010 letter to Williams' counsel states that the proctor would not have to concur in Williams' selection of surgical procedures, which, according to the guidance in the 2001 NPDB Guidebook, would militate in favor of finding that the proctorship was not a "restriction." But even assuming that the parties reached an agreement on that particular point, we cannot know whether there were any additional terms associated with the proctorship that, similar to those in *Azmat*, supra, and *Fobbs*, supra, would rise to the level of restricting Williams' privileges. We acknowledge that it is undisputed that the Hospital did not report the proctorship to the NPDB as an adverse action. While certainly favorable to Williams' position, we cannot say that the Hospital's assessment of the effect of the proctorship on Williams' privileges is dispositive. The Clinic argues that Williams conceded that the

15

proctorship was a restriction because in pleadings he filed in federal and state actions against the Hospital and other parties, he stated that a "proctorship was first imposed on [his] privileges at [the] Hospital . . . in May, 2010." The Clinic maintains that these statements constitute evidentiary admissions. We disagree with the Clinic's position, as Williams did not characterize the proctorship as a "restriction" in these pleadings, and his allegation that a proctorship was "imposed" on his privileges includes no specific details about how the proctorship impacted his privileges. Under the circumstances, a material issue of fact exists as to whether Williams' proctorship restricted his privileges under Article 7.1 (ii) of the Agreement.

Based on the foregoing, the trial court erred in concluding as a matter of law that the Clinic was authorized to terminate the Agreement when the Hospital imposed a proctorship on Williams, and we therefore reverse its order on the parties' cross-motions for partial summary judgment.

*Judgment reversed. Miller and Branch, JJ., concur.*

16