**FIRST DIVISION
BARNES, P. J.,
MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 12, 2020**

# In the Court of Appeals of Georgia

A19A1895. THE COLUMBUS CLINIC, P. C. v. WILLIAMS.

BARNES, Presiding Judge.

Reginald A. Williams, M. D. sued his former employer, the Columbus Clinic, P. C., accusing it of terminating his employment in breach of their contract. The trial court granted summary judgment to the Clinic with respect to liability. In *Williams v. Columbus Clinic*, 332 Ga. App. 714 (773 SE2d 457) (2015), this Court reversed that judgment, explaining that a genuine issue as to a material fact remained. On remand, and upon a supplemented record, the trial court granted summary judgment to Williams on the liability issue. Now, the Clinic appeals. As explained below, the record does not establish that either party was entitled to judgment as a matter of law, so we reverse.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). "We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant." *Matson v. Bayview Loan Servicing*, 339 Ga. App. 890, 890 (795 SE2d 195) (2016).

As set out in *Williams*, 332 Ga. App. 714, the factual background of this case includes the following.

Williams and the Clinic entered into a Physician Employment Agreement (the "Agreement") on December 31, 2008 under which Williams was to "provide professional medical and surgical services on behalf of [the Clinic] as an exclusive employee of [the Clinic]" and receive a salary as set forth in [an exhibit] to the Agreement. The term of the Agreement was for one year from its "Commencement Date" of January 15, 2009, and the Agreement provided that "[u]nless terminated as provided herein, this Agreement shall automatically renew for successive terms of one (1) year each upon the anniversary date of the Commencement Date." Section 7.1 of the Agreement sets forth the circumstances in which the Clinic was entitled to terminate the Agreement for cause and provides in relevant part:

2

[The Clinic] shall . . . have the right to terminate this Agreement immediately, with cause, upon written notice to Physician if: . . . (ii) Physician's privileges or staff membership at any hospital are terminated, revoked, suspended (other than for infrequent occurrences due to the failure to complete medical records in a timely manner), restricted, or terminated in any way (except for voluntary termination of privileges undertaken at the request and with the consent of [the Clinic]).

One of the Columbus hospitals where Williams had privileges was Doctors Hospital (the "Hospital"). Williams was granted Medical Staff membership on the Affiliate Staff at the Hospital in January 2009 and was granted Medical Staff membership on the Active Staff in January 2010 with privileges to render certain delineated professional services as approved by the Hospital's board of directors. On or about May 19, 2010, Williams was advised that the Medical Executive Committee ("MEC") of the Medical Staff of the Hospital was imposing a three-month proctorship on him. On or about June 18, 2010, the Clinic notified Williams that it was terminating his employment for cause under Section 7.1 (ii) of the Agreement, effective June 25, 2010. The Clinic's partners and board of directors believed that the Clinic was authorized to terminate the Agreement for cause because the mandatory proctorship imposed by the Hospital constituted a restriction of Williams'[s] privileges.

*Williams*, 332 Ga. App. at 715-716.

3

Williams filed this breach of contract action against the Clinic, claiming that despite the proctorship, his privileges had not been restricted at any hospital as contemplated by Section 7.1 (ii), and that the Clinic thus did not have requisite cause to terminate their Agreement. The parties filed cross-motions for summary judgment as to liability, the issue being whether the proctorship constituted a restriction of privileges so as to provide the Clinic with cause to terminate their contract. Ruling in favor of the Clinic, the trial court found that the language set out at Section 7.1 (ii) was "clear, concise, controlling, and unambiguous," and that thereunder, the Clinic was authorized to terminate the Agreement when the hospital imposed a proctorship on Williams. That ruling gave rise to *Williams*, 332 Ga. App. 714.

After reciting principles of contract construction,[1] *Williams* turned to the language in Section 7.1 (ii) of the Agreement authorizing the Clinic to terminate the Agreement for cause if Williams's "privileges . . . at any hospital are . . . restricted." *Williams*, 332 Ga. App. at 718 (1). The Clinic urged that affirmance of the summary

---

[1] Among such principles, *Williams* recited that the cardinal rule of contract construction is to ascertain the intent of the parties at the time they entered the agreement; that while contractual terms generally carry their ordinary meanings, technical words, or words of art, or used in a particular trade or business, will be construed, generally, to be used in reference to this peculiar meaning; and that a court must always consider the context in which a contractual term appears in determining its meaning. *Williams*, 332 Ga. App. at 718 (1).

judgment required nothing further than applying the ordinary or dictionary definition of "restrict," but *Williams* found it "readily apparent from the context in which 'restricted' appear[ed] in this Agreement that we must look beyond a dictionary to determine the intended meaning of the term." Id. As *Williams* elaborated, "[t]he privileges accorded to a physician to treat patients at a hospital are by their very nature always 'restricted' within the ordinary or dictionary definition of the term." Id. (quoting, among other definitions of relevant terms, a medical dictionary that stated that "[c]linical privileges are limited by the individual's professional license, experience, and competence"). And upon examining the Hospital's Medical Staff Bylaws, *Williams* reasoned that "interpreting 'restricted' in its ordinary sense here would mean that the Clinic essentially enjoyed an unfettered right of termination, a result contrary to the parties' clear intent to create a non-at-will employment relationship." Id. at 719 (1).

Thus determining that "a 'restriction' of privileges at a hospital is a word or term of art that should be interpreted in accordance with its 'peculiar meaning' in this context," *Williams* observed that the term "restricting" appeared in the Health Care

Quality Improvement Act (HCQIA).[2] *Williams*, 332 Ga. App. at 719 (1).

Summarizing aspects of the HCQIA and related regulations, *Williams* noted,

> Under the HCQIA, a hospital that takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days shall report the action to the State Board of Medical Examiners, and under the HCQIA's implementing regulations also must report the action to the [National Practitioner Data Bank (NPDB)]. A "professional review action" is defined in pertinent part as an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician and which affects (or may affect) adversely the clinical privileges of the physician. The term "adversely affecting" includes reducing, *restricting*, suspending, revoking, denying, or failing to renew clinical privileges or membership in a health care entity.

(Citations and punctuation omitted; emphasis in original.) Id. at 719-720 (1). Realizing that "neither the HCQIA nor the regulations thereunder provide[d] a definition of 'restrict,'" *Williams* found pertinent guidance in the 2001 NPDB Guidebook (portions of which were included in the record).[3] Id at 720 (1). In

---

[2] See 42 USC §§ 11101-11152.

[3] *Williams* noted that the 2015 version of the NPDB Guidebook contained statements providing additional guidance on the meaning of "restriction" and the circumstances under which a proctorship constituted a restriction, but determined that

particular, *Williams* noted that the 2001 NPDB Guidebook provided examples of actions that were reportable and nonreportable to the NPDB, and that such guidebook further stated that it would *not* be reportable if "based on assessment of professional competence, a proctor is assigned to supervise a physician . . . but the proctor does not grant approval before medical care is provided by the practitioner." Id.

In addition, *Williams* found instructive cases addressing when a hospital's action rises to the level of a professional review action that does or may adversely affect a physician's privileges for purposes of the HCQIA. As *Williams* analyzed, if the actions or recommendations that underlay cases such as *Mathews v. Lancaster Gen. Hosp.*, 87 F3d 624 (3d Cir. 1996),[4] *Morgan v. PeaceHeath*, 14 P3d 773 (Wash.

---

those statements were "not germane to determining the intent of the parties when they entered the Agreement in December 2008." *Williams*, 332 Ga. App. at 720 (1), n. 1.

[4] In *Mathews*, "the Third Circuit concluded that a letter recommending focused outside review of certain cases that had been identified by a hospital committee as involving substandard care was not a 'professional review action.' The Third Circuit stated generally that a 'decision or recommendation to monitor the standard of care provided by a physician or factfinding to ascertain whether a physician has provided adequate care' were professional review activities, i.e., preliminary investigative measures taken in a reasonable effort to obtain facts relevant to a possible change in privileges, not professional review actions." *Williams*, 332 Ga. App. at 720 (1), quoting *Mathews*, 87 F3d at 634.

App. 2000),[5] and *Wood v. Archbold Med. Center,* 738 FSupp.2d 1298 (M.D. Ga. 2010),[6] did not constitute reportable professional review actions, then they "necessarily did not adversely affect or restrict physician privileges." *Williams*, 332 Ga. App. at 721 (1). *Williams* went on to contrast those cases with *Azmat v. Shalala,* 186 FSupp.2d 744 (W.D. Ky. 2001),[7] and *Fobbs v. Holy Cross Health System Corp,* 789 FSupp. 1054 (E.D. Cal. 1992), rev'd in part on other grounds, 29 F3d 1439 (9th

---

[5] In *Morgan*, the Washington Court of Appeals cited *Mathews*, supra, in concluding that a recommendation that a physician submit to an outside professional evaluation did not amount to a professional review action, even where the physician was "warned that if he did not comply, his privileges would be automatically suspended." Id. at 780, 782 (I) (B). See *Williams*, 332 Ga. App. at 720-721 (1) (reviewing *Morgan*, supra).

[6] In *Wood*, the federal district court for the Middle District of Georgia cited *Morgan*, supra, in concluding that a recommendation that a physician undergo an outside psychiatric evaluation was not professional review action, even where the physician was "told . . . that if he did not have the evaluation, his privileges would be suspended." Id. at 1363 (V) (B) (3). See *Williams*, 332 Ga. App. at 721 (1) (reviewing *Wood*, supra).

[7] In *Azmat*, supra, the federal district court for the Western District of Kentucky concluded that a letter recommending that a surgeon obtain a second opinion on all procedures that were not immediately life-threatening and acquire assistance from a second physician on all major cases were restrictions on his privileges reportable under the HCQIA. Id. at 750. See *Williams*, 332 Ga. App. at 721 (1) (discussing *Azmat*, supra).

8

Cir. 1994).[8] Upon considering those authorities, *Williams* concluded that "at the time of contracting the parties would not have understood a hospital's decision to appoint a proctor to monitor or evaluate a physician or his or her standard of care as a restriction of privileges unless the hospital imposed conditions or limitations that would impact the physician's independence or autonomy in providing care to patients." *Williams*, 332 Ga. App. at 721 (1).

When next turning to the question whether the proctorship imposed upon Williams constituted a restriction on his privileges under that construction of the Agreement, *Williams* found that an issue of material fact remained. *Williams*, 332 Ga. App. at 721 (2). As *Williams* explained, "[d]etermining whether the proctorship was a restriction on Williams'[s] privileges requires examination of the specific terms and conditions of the proctorship"; yet, they were not sufficiently evinced by the record. Id. at 721-722 (2). As *Williams* espoused,

---

[8] In *Fobbs*, the federal district court for the Eastern District of California determined that monitoring constraints – under which a physician was required to have a second opinion on every admission (which included a history and physical examination by the monitor), and the monitor was to be present during operations and to participate in follow-up care – constituted professional review action. Id. at 1057, 1064 (V). See *Williams*, 332 Ga. App. at 721 (1) (discussing *Fobbs*, supra).

9

[T]he Hospital's Medical Staff Bylaws provide that "*[i]n most instances*, proctors act as monitors to evaluate the technical and cognitive skills of another Practitioner and do not directly participate in patient care, have no physician/patient relationship with the patient being treated, do not receive a fee from the patient, represent the Medical Staff, and are responsible to the Medical Staff." (Emphasis supplied.) While this provision may suggest that a proctor's role typically is solely evaluative, it also leaves open the possibility that a proctor could assume different or additional responsibilities. The record in this case contains scant evidence on the terms of the proctorship under which Williams operated.

Id. at 721-722 (1). Pertinently, "the record [did] not contain evidence as to the final proctorship terms, if any, to which the parties agreed." Id. at 722 (2). *Williams* acknowledged that evidence in the record – specifically, a June 18, 2010 letter from the Hospital's outside counsel to Williams's counsel ("Hospital's Letter") that stated that the proctor would *not* have to concur in Williams's selection of surgical procedures – militated in favor of finding that the proctorship was not a "restriction." Id. Notwithstanding, *Williams* recognized that the Court could not know whether there were any additional terms associated with the proctorship that, similar to those in *Azmat*, supra, and *Fobbs*, supra, would rise to the level of restricting Williams's privileges. Id. Based on the record before it, *Williams* held that the trial court erred

10

in concluding as a matter of law that the Clinic was authorized to terminate the Agreement when the Hospital imposed a proctorship on Williams, and thus reversed the summary judgment entered in the Clinic's favor. Id.

Upon the remittitur being entered in the trial court, the record was supplemented to include two documents: (i) the Proctoring Criteria, which was enclosed with the Hospital's Letter to Williams; and (ii) Williams's Performance Improvement Plan, wherein the Hospital's MEC described for Williams the manner in which his surgical cases would be "proctored concurrently." Each party again moved for summary judgment on the issue whether the proctorship constituted a restriction under the terms of the Agreement. After conducting a hearing, the trial court entered an order granting Williams's motion and denying the Clinic's. In pertinent part, the trial court determined,

> [T]he proctorship would largely have consisted of recommendations and suggestions, but clearly left the final decision in the purview of [Williams]. While certainly an inconvenience, such as advisor and observer would not constitute a restriction (as interpreted with[in] its "peculiar meaning" in this context) that would have adversely affected his privileges. . . . This [c]ourt finds that as a matter of law, that the terms of the Agreement were written such that, at the time of contracting, the parties would not have understood or intended for a

11

hospital's decision to appoint a proctor to, in and of itself, constitute a restriction of privileges.

In this appeal, the Clinic contends that the trial court erred in ruling in Williams's favor. The Clinic asserts that the two documents added upon remand, together with the Hospital's Letter (which was already a part of the record, as discussed in *Williams*, supra), provided all of the terms of the proctorship. Thus positing that "[t]he undisputed facts clearly show that the proctorship was a restriction as set forth in the Agreement," the Clinic argues that the proctorship, as a matter of law, constituted a restriction upon Williams's privileges, and consequently provided it with cause for terminating the Agreement. Williams counters that the record demonstrates that summary judgment was properly entered in his favor.

As this Court explained in *Williams*, determining whether Williams's privileges were restricted requires examination of the specific terms and conditions of the proctorship. *Williams*, 332 Ga. App. at 721 (2). At this juncture, both parties maintain entitlement to summary judgment – each side relying on aspects of the record as establishing as a matter of law that the proctorship either did or did not constitute a

12

restriction under the Agreement.[9] The Clinic cites that the Proctoring Criteria (which used "Surgeon" to refer to Williams ) set out, among other things, the following: (a) if the proctor has been identified for a case but at the last minute the proctor is himself called out for an emergency, "every attempt will be made by the Surgeon to obtain another proctor but at no time should a case be canceled or not proceed when the proctor is no longer available"; (b) with respect to the "[r]ole of proctor in confirming decision to operate," such document "suggest[ed]"[10] that the "Surgeon will consult with proctor on all cases prior to the case to discuss what surgical procedures Surgeon is recommending"; (c) that if at any time the proctor disagrees

[9] In some instances, the Clinic has made broad assertions, while providing in support thereof record citations to a span of pages covering both the Proctoring Criteria and the Performance Improvement Plan. See, however, Court of Appeals Rule 25 (c) (2) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of a specific reference, the Court will not search for and may not consider that enumeration."). "Our requirements as to the form of appellate briefs were created not to provide an obstacle, but to aid parties in presenting their arguments in a manner most likely to be fully and efficiently comprehended by this Court; a party will not be granted relief should we err in deciphering a brief which fails to adhere to the required form." (Punctuation and footnote omitted.) *Campbell v. Breedlove*, 244 Ga. App. 819, 821 (535 SE2d 308) (2000).

[10] As noted above, among its bases for granting summary judgment to Williams, the trial court expressly found that the proctorship "largely consisted of recommendations and suggestions, but clearly left the final decision in the purview of [Williams]."

13

with the decision to operate, the specific operation intended, or the specific technique(s) being used during a procedure, "the Surgeon should follow the advice of the proctor but the final decision lies with the Surgeon"; (d) that if, in elective cases, the proctor disagrees with the decision to operate or on the specific procedure/approach recommended, the document "suggest[ed]" that "the proctor and Surgeon will attempt to solicit input from another member of the [Hospital's] surgical department. In elective cases, the final decision as to appropriateness of the procedure needed lies with Surgeon"; and (e) that such document ended with the warning: "any deviation from these guidelines and policies will result in further disciplinary action by the [MEC]."

The Clinic further cites that the Performance Improvement Plan, which expressly stated that "your surgical cases must be proctored concurrently," set out that "[i]n no event may an elective case be scheduled with less than 12 hours notice to the proctor, unless the proctor agrees otherwise"; that "[t]he proctor has the authority to intervene in the case if necessary to protect the patient from harm"; and that Williams was "responsible for informing [his] patients that another physician will be examining them and reviewing their chart."

14

Viewing the evidence in the light most favorable to the Clinic (as the nonmovant on Williams's summary judgment motion), we agree with the Clinic that Williams was not entitled to the grant of his motion. The evidence authorized a finding that under the proctorship, Williams would consult the proctor *beforehand* to discuss surgical operations and techniques intended; that the proctor would give Williams his or her opinion(s) on whether the medical care planned by Williams was appropriate; that if Williams and the proctor disagreed, the proctor could solicit input from another member of the Hospital's surgical department; that elective surgeries that Williams scheduled within a 12-hour window could be halted (at least temporarily) by the proctor; and that during surgical procedures, the proctor could "intervene in the case if necessary to protect the patient from harm." Viewed in the Clinic's favor, the evidence allows for a determination that the proctorship was more akin to the circumstances underlying *Azmat* and *Fobbs*,[11] and that it impacted Williams's independence or autonomy in providing care to his patients so as to amount to a restriction on his privileges under the Agreement.

This does not automatically mean, however, that the Clinic's summary judgment motion should have been granted. For purposes of determining whether the

_____

[11] See footnotes 7 and 8, supra.

15

Clinic was entitled to the grant of its motion, we must construe the evidence in the light most favorable to Williams (as the nonmovant). See *Matson*, 339 Ga. App. at 890. So viewed, the record indeed supports the trial court's finding that the proctorship consisted largely of recommendations and suggestions, while leaving final decisions in Williams's purview. The Proctoring Criteria plainly and repeatedly placed final decisions solely with Williams. This would include the final decisions as to any dispute between Williams and the proctor *during* a surgical procedure. Seemingly contradictory to the Performance Improvement Plan (authorizing the proctor "to intervene in the case if necessary to protect the patient from harm"), the Proctoring Criteria set out:

> If at anytime the proctor disagrees with the decision to operate; the specific operation intended; or the specific technique(s) being used during a procedure, the Surgeon *should* follow the advice of the proctor *but the final decision lies with the Surgeon*. Immediately following the procedure the proctor will report any deviation from recommendations to the . . .[Hospital's executive personnel]. If patient safety is in jeopardy at anytime during the procedure due to a disputed decision between the Surgeon and the proctor, the proctor will immediately notify the Anesthesiologist who will notify the [Hospital's executive personnel].[12]

---

[12] (Emphasis supplied.) Williams asserts in his appellate brief that the final sentence quoted above "obviously takes precedence over the language from the

16

The Clinic points out that the Proctoring Criteria warned that – as the Clinic puts it – "if Williams did not follow the proctor's advice, the case would be subject to further review." But such a warning as to after-the-fact measures available to the Hospital could fairly be viewed as akin to the warnings given to the physicians in *Morgan* and *Wood*[13] and thus not restrictive of privileges here. See *Williams*, 332 Ga. App. at 721 (1).

The Clinic points to evidence that the proctorship contemplated that Williams would consult with the proctor on medical procedures, and obtain the proctor's approval when scheduling elective surgeries within a 12-hour window. But viewed in Williams's favor, the record allows for a determination that those matters were geared toward facilitating that an adequate proctor was available and positioned to monitor Williams's technical and cognitive skills. As the Performance Improvement Plan stated, "The person providing the concurrent proctoring must have appropriate clinical privileges" and "must be present before the case is started and must remain

[Performance Improvement Plan] quoted by [the Clinic], as it was provided in the Proctoring Criteria provided by the Hospital's attorney with the June 18, 2010 Letter." But the record shows that Williams executed the Performance Improvement Plan on June 22, 2010, thereby agreeing to "abide by and participate in the [P]erformance [I]mprovement [P]lan outlined [therein]."

[13] See footnotes 5 and 6, supra.

17

throughout the duration of the case." And as the Proctoring Criteria provided, "[i]n elective cases, the final decision *as to appropriateness of the procedure needed* lies with Surgeon." (Emphasis supplied.) And as the Hospital's Letter relayed, "Any costs associated with the proctor must be assumed by Dr. Williams." See *Williams*, 332 Ga. App. at 720-722 (1) (ascertaining from Hospital's Medical Staff Bylaws provision that, where "proctors acts as monitors to evaluate the technical and cognitive skills or another Practitioner and do not directly participate in patient care, have no physician/patient relationship with the patient being treated, [and] do not receive a fee from the patient being treated," such role is "solely evaluative").

> In addition, Williams cites that the Hospital's Letter explicitly informed him,
>
> The role of the proctor is not to substitute his/her judgment for that of Dr. Williams, but to assist, advise as requested, observe and report. The proctor need not concur in the selection of the surgical procedure, but the proctor's concerns or disagreement should be noted and evaluated. As such, the proctoring requirements are not reportable to the [NPDB] an do not constitute an adverse action that gives rise to the right to request a hearing.

And as *Williams* discerned, the Hospital's Letter – stating that the proctor would not have to concur in Williams's selection of surgical procedures – militates in favor of finding that the proctorship was *not* a restriction. *Williams*, 332 Ga. App. at 722 (2).

18

Williams further cites his own affidavit testimony that, as of the effective date of his termination (June 25, 2010), the Hospital had not "ever submitted a report, written or otherwise, to any appropriate physician licensing board that [his] medical staff privileges had ever been denied, restricted, or revoked for any reason"; nor had the Hospital "report[ed] [him] to either the appropriate Georgia licensing board or to the [NPDB] when it imposed a proctorship upon [him]." See generally *Williams*, 332 Ga. App. at 719-720 (1) (ascertaining from HCQIA, related regulations, and 2001 NPDB Guidebook that it would not be reportable if a proctor is assigned to supervise a physician, but the proctor does not grant approval before medical care is provided by the practitioner). Such evidence that the Hospital did not report the proctorship either to the Georgia licensing board or to the NPDB indicates that the proctorship thus did not restrict Williams's privileges.[14] See *Williams*, 332 Ga. App. at 720-721 (1) (analyzing that if actions underlying cases such as *Mathews*, *Morgan*, and *Wood*,

---

[14] See generally OCGA § 31-7-8 (a) (providing that "[t]he hospital administrator or chief executive officer . . . shall submit a written report to the appropriate licensing board when a person who is authorized to practice medicine, . . . and who is a member of the medical staff at the institution, . . . has his medical staff privileges at the institution . . . restricted . . . for any reason involving the medical care given his patient").

19

supra, did not constitute reportable professional review actions, then those actions did not adversely affect or restrict physician privileges).

Viewing the evidence in the light most favorable to Williams (as the nonmovant on the Clinic's summary judgment motion), we conclude that the Clinic was not entitled to the grant of its motion. As noted above, the evidence supports the trial court's finding that the proctorship consisted largely of recommendations and suggestions, while leaving final decisions in Williams's purview. Moreover, the evidence authorized (but did not require) the trial court's findings that

> While certainly an inconvenience, such as advisor and observer would not constitute a restriction (as interpreted with[in] its "peculiar meaning" in this context) that would have adversely affected his privileges. . . . [And] at the time of contracting, the parties [did] not . . . intend[ ] for a hospital's decision to appoint a proctor to, in and of itself, constitute a restriction of privileges.

Viewed in Williams's favor, the evidence allows for a determination that the proctorship put in place "preliminary investigative measures taken in a reasonable effort to obtain facts relevant to a *possible change* in privileges," (emphasis supplied) *Williams*, 332 Ga. App. at 720 (1) (citing *Mathews*, 87 F3d at 634), but that it did not

20

rise to the level of impacting his independence or autonomy in providing care to his patients so as to amount to a restriction on his privileges under the Agreement.

"The cardinal rule of contract construction is to ascertain the intent of the parties at the time they entered the agreement." *Williams*, 332 Ga. App. at 718 (1). "Construing the terms of an express contract is generally a question of law for the court, unless an ambiguity is presented which cannot be resolved by the ordinary rules of construction." (Citation and punctuation omitted.) Id. At the time of *Williams*, supra, the record did not allow for a determination as a matter of law whether the proctorship imposed upon Williams constituted a restriction on his privileges under the Agreement. Id. at 722 (2). Here, despite each party's ongoing quest for summary judgment upon a record supplemented after *Williams*, neither party has cited either evidence or a principle of contract construction that resolves that ambiguity as a matter of law. As neither party has demonstrated entitlement to summary judgment, the contested judgment must be reversed.[15] See *Borders v. City of Atlanta*, 298 Ga.

[15] In his appellate brief, Williams asserts that his privileges were not restricted on the additional ground that the Hospital's MEC did not have legal authority to do so. But such ground was not ruled upon by the trial court, and we do not reach it here. Nothing herein precludes Williams from properly seeking a ruling from the trial court as to that ground upon remand. See generally *Mom Corp. v. Chattahoochee Bank*, 203 Ga. App. 847, 847 (1) (418 SE2d 74) (1992) ("On a reversal of summary judgment, a case is remanded in the posture existing prior to summary judgment.").

21

188, 196 (II) (779 SE2d 279) (2015) (where the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury); *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) ("Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met.").

*Judgment reversed. Mercier and Brown, JJ., concur*.